**Ex parte Jose Moises GUZMON.**

**No. 69615.**

Court of Criminal Appeals of Texas, En Banc.

April 8, 1987.
Rehearing Denied May 20, 1987.

Will Gray, Houston, for appellant.

Patrick C. Batchelor, Dist. Atty., Corsicana, Jim Voller, Sp. Prosecutor, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Applicant was convicted of capital murder and his punishment assessed at death after the jury answered three special issues in the affirmative. Article 37.071, V.A.C.C.P. On direct appeal to this Court the judgment of the trial court was affirmed. *Guzmon v. State*, 697 S.W.2d 404 (Tex.Cr.App.1985). Subsequently applicant filed an application for writ of habeas corpus pursuant to 11.07, V.A.C.C.P. A hearing was held on the writ in the trial court, which denied relief. We ordered the writ filed and set for submission to consider applicant's claim that he was denied the effective assistance of counsel both at trial and on direct appeal.

The facts of the offense are well summarized in Presiding Judge Onion's opinion on direct appeal. 697 S.W.2d at 406–07. Briefly restated, applicant and two companions were returning from Houston to Dallas when they stopped at a service station outside Corsicana because they had developed car trouble. The time was 1:30 a.m. Brian Ingram, the lone attendant at the Shell station, had no tools to loan the three men but directed them across the highway to an Exxon station. Ingram testified at trial that applicant appeared intoxicated and spoke no English. At the Exxon station, Albert Webb, the attendant, tried to repair applicant's car but gave it up as hopeless. A few minutes later another customer, Henry Finch, arrived, and Webb replaced the headlights on his Ford Granada. Afterwards, while Webb and Finch were inside the station, applicant entered with a gun and demanded the keys to the Granada. Finch informed him that the keys were still in the car. Applicant ran to the Grana-

da and got in the passenger side, joining his two companions who were already inside and trying to start the car. Finch ran after him and around to the other side of the car, where he opened the door and grappled with the driver, trying to drag him from the car. Applicant leaned forward and shot Finch, inflicting a wound that proved fatal. Applicant and his companions drove on to Dallas, where he was later arrested by police who had traced his identity and address through the car he had abandoned at the Exxon station in Corsicana.

Applicant's trial for capital murder, at which he claims to have been afforded ineffective assistance by his two court-appointed attorneys, began some four months later. We shall examine that trial in light of testimony later adduced at applicant's writ hearing.

### I. Voir Dire

Applicant was an illegal alien from El Salvador. He contends that counsel were ineffective for, *inter alia*, informing the prospective jurors of this fact. He complains particularly of their method of informing the jury. Counsel referred to their client as a "wet-back." An excerpt from defense counsel's examination of Karen Fate serves to illustrate this technique.

> Q. Well, generally we find people who, while their knuckles are clinched [sic] tight, say some of my best friends are black people. Well, we know they don't really mean that, and you know, in other situations just an opinionated situation is when I drive down the highway, and I see a skunk that has been run over by a car. I turn my nose up in anticipation, because I'm opinionated about that smell. Now, that is a far-fetched, far-stretched absurdity, but both of those are realistic feelings that we have, you know, that effect [sic] our decisions. Now, Moises Romero[1] is a wet-back. He is, as termed, that he is an illegal alien in this country. Would he be starting out at a disadvantage because he is

---

1. Applicant was variously known at trial by the surnames Romero and Guzmon. These were apparently both family names, although in the charge to the jury one was submitted as an "alias."

not a citizen and not raised in Corsicana, Texas, in your eyes?

A. No.

Q. Do you feel like, and this goes to what we all, what our roots are about. Do you feel like that he is entitled to the same rights, privileges and obligations in this country as if he were a citizen?

A. Not to a total extent, I don't think.

    *     *     *     *     *     *

Q. And do you feel like that they have the basic rights that we have as Americans, and because this is a free country?

A. The basic rights, yes.

This venireperson was subsequently accepted by both sides as the first juror. Another, who also became a juror, was informed by defense counsel, "Now, we've kind of touched on it before here, now, Jose Moises Romero is a Salvadoran. I think probably the District Attorney could come up and show that he's what's commonly called a wet-back ..."

That the district attorney could legally have made such a showing to the jury, however, is not beyond dispute. At the writ hearing Robert Dunn, applicant's attorney at trial, was asked whether he thought the information that applicant was an illegal alien would have been admissible at the guilt phase of trial, and responded, "I don't know that it would have been." He thought, however, that the jury would get that impression anyway because of the fact that applicant spoke only Spanish. Additionally, referring to his client as a wet-back was part of his voir dire strategy:

> And I felt since we did have a minority race client, Mr. Smith and I felt that it was, indeed, necessary for us to root out any prejudice that existed and in my opinion the best way since we were interviewing these jurors on an individual basis where we had a one-on-one situation with complete eye contact I felt it was better to bring forward all the prejudicial matters that might or might not be brought just to see if their knuckles turned white or if they grimaced or if they were quick to answer either for or against the term and I used many terms

> ... I even used the term "wetback," just to elicit reaction. I was in hopes on an overall basis to elicit the sympathy of this jury as an underlying main streme [sic] trial tactic.

Furthermore, counsel didn't personally feel that the term wetback carried any "bad connotation."

The use of this ethnic slur in reference to his client was, therefore, part of a conscious strategy in selecting jurors. In at least one instance, the tactic arguably worked well, when counsel questioned Barbara Brooks and informed her that his client "is an unauthorized immigrant, or we might call him a wet-back, which—" "I wouldn't," responded Brooks, and was subsequently accepted on the jury.

More often, however, counsel failed to act on the apparent prejudices he uncovered. Following is an excerpt from the voir dire examination of Ronnie Owens:

Q. I've spoken about my client here. He's a Salvadoran. San Salvador, where all the problems are going on. He's a wet-back, and based on that, would you have any adverse feelings about him?

A. No, sir.

Q. You feel that these illegal aliens, once they're here have the right to all the guardianships of our law?

A. No. I don't think that's right.

Q. Well, would this cause you to feel strongly enough against him?

A. No. I don't think so. Not in this case.

In spite of his expressed opinion that illegal aliens such as applicant are not entitled to "all the guardianships of our law," Owens was accepted by the defense and served on the jury. Another venireman, David Brown, an attorney personally known to both the prosecutor and defense counsel, expressed much stronger feelings about illegal aliens in response to defense questioning. Asked if he was "opinionated" in "any areas that might effect [sic] your judgment in this trial?" Brown replied, "Possibly so. Frankly, yes." He went on to explain:

A. Okay. I'm very, very concerned about the illegal alien problem in this country, and the main reason that I am is that I have two ranches in South Texas, and I've got—I've been ranching in South Texas since 1977, and I've seen a tremendous change in the number of aliens that are crossing the River. [Illegal aliens used to come only to find work and feed their families and] I admired them to some degree ... But since that time things have changed down there, and now I am seeing a tremendous flood of illegal aliens cross my ranch, and they are doing destruction, and they have no apparent regard for property. And in fact there have been some shooting incidents down there with rancher families, and I think anybody that's in that situation in South Texas is extremely concerned about it.

And for that reason I have very strong feelings about it. As a matter of fact, two years ago my son's Blazer was stolen off my place, by an illegal alien, and he took his gun. He took clothes. He took the Blazer. He drove through my fence, got onto the highway. They caught him in Uvalde. He was in jail two days, and released, and nothing was done.

Q. Well, David, based upon what you just said to me, would that start Jose Romeor [sic] in anything other than an equal position?

A. It might.

Q. Would you not be able to make a fair decision in this case?

A. I would have to struggle with it.

Q. Could you do it?

A. I would make myself do it.

Q. That's your answer to the Court, you would make yourself do it?

A. Uh huh.

This venireman, whose son had been the victim of a crime similar to the underlying felony in applicant's case, and who candidly admitted that he would have to "struggle" to make a fair decision, was not challenged for cause nor peremptorily struck by the defense. He was accepted by both sides and became the foreman of the jury that later convicted applicant in fifteen minutes.

Thus trial began with a jury that had been informed that the defendant whose case they were to judge was a "wet-back," that his very presence in this country was illegal. Some members of that jury did not feel applicant was entitled to all the protections afforded United States citizens.

## II. GUILT—INNOCENCE

The State's case on guilt-innocence was straightforward and relatively brief. Two eyewitnesses, the service station attendants, testified to the facts of the offense. Defense counsel's crossexamination demonstrated that he had visited the scene. He elicited testimony showing the distance and obstructions that might have obscured the witnesses' view of the shooting, as well as the similarity in appearance among applicant and his two companions that might have produced a misidentification. The State also presented testimony from Officer Raymond Rosas as to the circumstances of applicant's arrest,[2] and from a medical examiner as to cause of death.

---

**2.** One point of contention that arose at the writ hearing but not at trial concerned Officer Raymond Rosas' description of petitioner's arrest in Dallas. Rosas testified that after petitioner was arrested and placed in a squad car he spontaneously said, without being questioned, "El ola tembi." At trial Rosas elaborated that this phrase means in Spanish, "I knocked him down," and that this is a slang term meaning "that he shot him." Furthermore, Rosas testified that petitioner was referring to the victim of the capital murder, Finch, though he admitted on crossexamination that he didn't ask petitioner specifically whether he was referring to Finch. That was the extent of the defense challenge to Rosas' interpretation of petitioner's

spontaneous utterance. At the writ hearing Dunn testified that he had been aware that Rosas would testify as to the meaning of the phrase. Further, he had checked with the interpreter, Perez, who informed him that Rosas was correctly interpreting the phrase.

However, Perez testified at the writ hearing that the phrase "el ola tembi" has no meaning in Spanish. In particular, there is no Spanish word "tembi." (The State's attorney argued that the phrase may have been misspelled by the court reporter who was not a Spanish speaker. If so, the State would have been well advised to object to the spelling before the record was approved, especially in light of the fact the State relied on this phrase to argue to the jury that

The ineffective assistance of which applicant now complains manifested itself when the defense presented its case. The sole witness offered by the defense was applicant himself. Problems began even before this testimony, when defense counsel approached the bench to ask the trial court, apparently out of the hearing of the jury, "I'm afraid for my protection that we warn him of the ramifications of his testifying. He has told two different stories in the last five minutes, and I would, if you don't mind, and I apologize for not telling you this, but I would appreciate it." The jury was then removed and counsel had the following colloquy with applicant through the interpreter:

Q. Have you asked myself and Mr. Smith to be able to take the witness stand in this case?

A. He says no. He did not ask him.

Q. Does he want to take the witness stand? Ask him does he want to testify in his own defense.

A. Yes.

Q. Does he understand that his testimony will be subject to the cross examination by the District Attorney?

A. He says yes.

This brief passage illustrates what Presiding Judge Onion pointed out on applicant's direct appeal: "It appears that neither the attorneys nor the interpreter understood the proper use of an interpreter. The attorneys frequently phrased their questions 'Ask him if he ...' and the interpreter frequently stated, 'He says ... Says he did ...' Attorneys should ask their questions as if no interpreter was present. The interpreter should translate the question and answer in a literal manner." *Guzmon*, supra, at n. 1. It was clear from the voir dire examination that applicant's attorneys did not understand the proper function of an interpreter. They gave each potential juror an explanation of that function similar to the following, from the voir dire examination of venireperson Betty Maxwell:

I believe that Spanish, in my own words, is a long-talking language. There is a lot of words that go to make up a small sentence in English. They do not have the language structure we do. There are many, many adverbs and adjectives that are required to say one simple sentence in English. Therefore, when you're listening as a juror, you may very well hear Mr. Romero say lots of words, and maybe Mr. Perez [the interpreter] turn to the jury and say, he said no. Do you feel like, or do you understand that you're not being cheated of the response, other than it will only be short?

The jurors were thus told that they would be hearing not applicant's own words, but a paraphrase. That appears to be what they did hear when the defense presented its case on guilt-innocence. At the writ hearing Manuel Perez, the interpreter at trial, testified that at that time his primary employment was as the owner of Manuel's Restaurant in Corsicana. He had also served as interpreter in two previous trials, one of them a civil case. His qualifications to serve as interpreter were that he was Mexican-American and had grown up with Spanish as a second language; he had also studied Spanish for two years at the University of Texas at El Paso. He had not

petitioner had admitted shooting deceased. "It is not too much to require diligence on the part of the State to assure accuracy of the record on a point that would almost certainly be raised on appeal." *Hammett v. State*, 713 S.W.2d 102–106 (Tex.Cr.App.1986).) Another witness at the writ hearing, Reynaldo Cantu, testified that Central Americans, such as petitioner, employ a different vocabulary than Mexicans or Mexican-Americans, and that it would be a mistake to assume that the two groups will always understand each other. Defense counsel did not delve into this potential source of misunderstanding at trial and so the jury was left with Rosas' unchallenged assertion that upon being arrested petitioner spontaneously confessed to the offense.

studied Salvadorian Spanish, but said it differed in only "[a] few words, you know, just one or two words, but it's not any different than our Spanish."

Another witness at the writ hearing testified to the contrary. Reynaldo Cantu was a Spanish-speaking lawyer and former District Attorney of Cameron County, on the Mexico-U.S. border. He had tried cases involving Central American defendants or victims and as a result of his experience had "found that the need for a specially qualified interpreter is very, very crucial in order that justice might be done."

The difficulty is that the central Americans use a differnt vocabulary. They're not colloquialism, they're just words. They're not as commonly used among the Mexican-Americans or even Mexicans, and I think it's also a large misconception that Mexican-Americans understand the Spanish that is spoken.

This misconception would lead to even greater misunderstanding when the interpreter is paraphrasing a defendant's words rather than interpreting exactly, as in the instant case. Perez testified at the writ hearing that sometimes he would find applicant's answers unresponsive or hard to follow and so would tell him to start over again or rephrase his responses.

These difficulties proved a barrier between not only applicant and his attorneys but between applicant and the jury when he attempted to testify in his own behalf. He was not aided by his attorney, who asked him only a few questions to set the stage and then simply asked what happened at the Exxon station the night of the offense. Applicant's ensuing rambling, confused narrative consumes six pages of the statement of facts, during which time he was unguided by his attorney.[3] He was aided only by the interpreter, who prefaced most sentences of applicant's testimony with "He says ..." or more simply, "Says ..."

Applicant testified that he had been doing a favor for one of his friends in giving him a ride to Houston that night, that he had been very drunk and was overborne by circumstances. His two companions tried to steal from the "machines of business" in the service station, though he warned them not to do so. When trouble erupted and his friends ran to the deceased's car he had no choice but to accompany them. This narrative was interspersed with comments about his job, his wife and family who were waiting at home for him, and his troubles that had ensued from merely trying to help a friend. Finally Dunn interrupted him (although addressing the question to Perez, the interpreter) to ask if he had shot the deceased, to which applicant replied, "I did not have the courage to hurt the man. I had no reason to hurt that man." He also denied having had a pistol in his possession. Defense counsel then asked where in the car applicant was sitting. Applicant in the course of a mostly nonresponsive answer replied that he had been sitting in the middle of the front seat (the two eyewitnesses had placed him on the passenger side and testified that the man on the passenger side had fired the shot.) Defense counsel passed the witness.

The prosecutor's first question on cross-examination was, "Mr. Romero, you're absolutely not going to admit that you shot this man? I said, are you not going to admit that you shot this man?" The interpreter gave applicant's response as "No way." The district attorney asked, however, "Did he say that first?" and the interpreter replied, "No. There was something else. Said, any other person would have said the same thing."

Soon after this question the prosecutor took another tack. He asked, "Isn't it a

---

**3.** Before applicant's answer began defense counsel invited the District Attorney to object to this "general question" if he wished, but the District Attorney, apparently satisfied with the procedure, did not do so.

fact that you aren't like the illegals that come over from Mexico looking for work? You were in the Army in Salvador when you hooked it, weren't you?" This question was immediately followed by this exchange:

MR. DUNN: Objection, your Honor. That's an out-of-Court statement, unless Mr. Batchelor [the prosecutor] can back it up.

MR. BATCHELOR: I can back it up, your Honor.

THE COURT: I overrule the objection.

MR. DUNN: Note our exception.

Q. (By Mr. Batchelor) Ask him if he needs time to think of a good answer.

MR. DUNN: Objection, your Honor. Side-bar comment . . .

The prosecutor went on to ask applicant if he had been "laughing and joking throughout this whole jury selection and this trial" and referred to an instance outside the jury's presence when applicant had seen a book with a picture of an executioner and had made some sort of joke. This line of questioning continued, interspersed with an overruled objection from defense counsel, until applicant asked, "Says, what does that have to do with it, he says?"

The defense rested its case, which covers some twenty pages of the statement of facts. The State rested as well, and both sides closed. This phase of trial had begun at nine o'clock in the morning and ended at noon, three hours later.

In final argument on guilt-innocence defense counsel argued that the eyewitnesses could have been mistaken in their identification, and reminded the jury, "Now, you know, understand this man is, as I said, an unauthorized immigrant, a wet-back, whose hair is brown, and whose skin is probably about the color of mine, though he's not as fat, but they all look like that. All three of them look like that . . ." Calling his client

a "wet-back" was supposedly a defensive strategy for rooting out prejudice in prospective jurors. What possible value it could have had to use the same term after the jury had been selected and had heard the evidence is difficult to fathom. There was, of course, no objection to the use of the slur because it came from applicant's own counsel.

The jury retired to deliberate and returned with a verdict of guilty fifteen minutes later.

## III.  PUNISHMENT

On punishment the State did not reoffer the evidence adduced during the guilt-innocence phase. They offered only one witness, the sheriff of Navarro County, who had had applicant in custody pending trial. He testified that while in jail applicant threw a cup of hot water on another inmate, and threw an ash tray at that same inmate—whether on the same or a different occasion was not made clear. The sheriff further testified that a search of applicant in jail had produced a piece of wire "that had been sharpened on one end to form a shif. (sic)" The witness characterized applicant's attitude while in custody as "[d]isruptive and violent when he's crossed."

· The crossexamination was very brief and threw no light on the dispute between applicant and the other inmate. Defense counsel testified at the writ hearing that he had been completely surprised to hear of the jail incident. Though he made frequent trips to the jail, he had not heard of any problems applicant had had there. This is not surprising considering counsel had a very hard time communicating with his client at all. See *post.*

The defense offered three punishment witnesses. One was a friend of applicant's wife who testified that he had a good reputation in the community and was a good husband and provider. The second witness

was applicant's wife, who also testified through the interpreter. She said that applicant had never been in trouble before. Her testimony on direct examination ended with this exchange:

Q. Ask her does she understand that it's the jury's decision to either issue a sentence of life imprisonment or death at this time.

[A State's objection that this was a misstatement of the law was sustained.]

Q. (By Mr. Dunn) Ask her does she feel like a life imprisonment sentence would best benefit her husband.

A. Wants to know in what regard? How?

Q. As opposed to death.

A. She says, I don't know what to tell you.

Q. Pass the witness.

The last defense witness on punishment was Wendell Dickerson, a psychologist who had interviewed applicant in jail, through the interpreter and not very satisfactorily. He could not do full scale testing of applicant because of the language barrier. But he testified in general that it is almost impossible to predict future dangerousness, and that a psychologist who made such a prediction would be wrong two out of three times.

Defense counsel also elicited testimony from Dickerson concerning "people that come from the Latin culture as against the Anglo-Saxon culture." Dickerson testified that in Spanish, "[w]ords can mean different things, and it's often times somewhat more difficult to get right to the confrontive facts of whatever a situation may be." This plus a "well known proclivity towards pride" make it difficult for Spanish speakers to be direct and straightforward. In response to another defense question Dickerson said people such as applicant therefore seem irresponsible and "try to explain away things."

At the writ hearing Dunn testified that he was disappointed in the psychologist's testimony, "to say the least." Dickerson had come highly recommended from another practitioner, but he had never given Dunn a written report before trial and as a witness he had turned out to be "more of a burden to the defense than he was an asset ...." Asked the purpose of the questions about "people from Latin culture," Dunn said he had wanted the psychologist to explain to the jury why applicant so often gave nonresponsive answers:

A. It was just an attempt to explain the testimony of the Defendant.

Q. Even then you asked Dickerson, "Would you say they try to explain away things?" What was the purpose of that question?

A. Exactly the nature of the question, to try to again explain away why the Defendant had made this long, flowery narration and never said anything.

Of course, when applicant had testified his counsel had hardly asked any questions to interrupt the "long, flowery narration."

More importantly, if the psychologist's testimony was a "disappointment" to the defense attorneys, why did they choose to highlight the most damaging portion of that testimony in final argument to the jury? William Smith, applicant's other court appointed attorney, after again telling the jury, "Jose Romero is a wet-back, an illegal alien," went on to remind them:

We also had Dr. Dickerson tell us about the attitudes, his impressions of the attitudes of the Latin Americans, wherein they can't take responsibility. They have to pass away everything as somebody else's fault. I think we'll all agree, yesterday afternoon when Mr. Romero was on that witness stand he wasn't a very good performance [sic]. I'll be frank with you. No sense hiding it from you. I think you knew it. Mr. Romero was taking the position that Dr. Dickerson pointed out. He wouldn't take

the responsibility. He wanted to say it just happened.

What was the purpose of this argument? When first questioned at the writ hearing Smith didn't remember having made it, or why. "I don't even recall it, to tell you the truth. To tell you a theory I would be hard pressed to do it." On further questioning he decided:

A. The theory behind the argument in retrospect now I guess was that we were trying to elicit some kind of sympathy for this poor unfortunate who was sitting here.

Q. Who wouldn't take responsibility and wanted to say it just happened?

A. That at the time was pretty much what had come out, I think.

\* \* \* \* \* \*

Q. Well, my question, though, is: How would the fact that he wouldn't take the responsibility for what—the act that he committed generate any sympathy whatsoever?

A. I felt it would, that he didn't understand what he was, you know, his actions; and in his mind he couldn't take responsibility for it. That was my thinking, Mr. Gray.

## IV. WRIT HEARING

Obviously many of the problems in presenting a defensive case arose from the difficulty applicant's attorneys had in communicating with him. Neither of them spoke any Spanish; applicant spoke no English or precious little. When Dunn would visit his client in jail he was sometimes accompanied by the court appointed interpreter, but when Perez couldn't get away from his restaurant Dunn used deputy sheriffs to translate. He made ten to

twelve jail visits to his client but obtained very little useful information, particularly about applicant's background. Thus he was completely surprised at the District Attorney's assertion at trial that applicant was a deserter from the Salvadoran army and had no information with which to refute that allegation.[4] He also knew nothing about applicant's dispute with his fellow inmate and was in no position to refute or place in proper context the only evidence the State offered during the punishment phase of trial.

Applicant also offered at the writ hearing the testimony of Reynaldo Cantu, the former district attorney of Cameron County who had tried many cases involving Central Americans. He testified that a specially qualified interpreter is "very, very crucial" in such cases. Based on his examination of the record he did not believe that the interpretation of applicant's trial testimony had been accurate. He also believed that a "competent attorney" would have interrupted his client's long, rambling narrative in order to present the testimony effectively. Further, some of applicant's responses would have signalled a "reasonably effective defense lawyer" that his client didn't understand the proceedings.

## V. THE STRICKLAND STANDARD

In asserting that he was denied effective assistance of counsel applicant relies on *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (hereafter *Strickland*). In *Strickland* the Supreme Court of the United States set out the claims a convicted defendant must prove, under the Sixth Amendment to the U.S. Constitution, in order to have his conviction overturned due to ineffective assistance of counsel. The Court concluded that the purpose of affording a defendant the right to effective assistance is to ensure

---

**4.** Applicant's attorney at the writ hearing implied that applicant had been only fifteen or sixteen at the time of his army service and had in fact been discharged for medical reasons

rather than deserting. There is nothing in the record before us, however, to indicate which version of the termination of applicant's army service in El Salvador is accurate.

that the defendant receives a fair trial. Therefore,

> [t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

104 S.Ct. at 2064. Under *Strickland* a defendant seeking relief must meet two tests: "First, the defendant must show that counsel's performance was deficient ... Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Elaborating on the "prejudice" prong of this two part test, the Court said:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 2068.

In the instant case the "adversarial process" was undermined to a significant degree. First of all, it may have been difficult for the jury to realize whose side defense counsel were on when they continued to refer to applicant as a "wetback," not only during voir dire when this arguably had some strategic value, but also during final argument on both guilt and punishment, when it could have had none. This was no doubt particularly harmful when addressed to these jurors, some of whom had expressed doubts that such an illegal alien was entitled to all the protections United States citizens are afforded.

Counsel were also ineffective in their improper use of the interpreter. This was not entirely the fault of defense counsel, who did not speak Spanish, but it was nonetheless ineffective. In the guilt phase of trial the only defense witness was applicant. It was therefore crucial that he be able to convey his story to the jury, in his own exact words. That he was obviously being paraphrased by the interpreter may well have lessened the impact of that story. Furthermore, defense counsel did nothing to guide this crucial testimony. Instead of asking specific questions in order to have applicant address the issues of the case, counsel allowed him to ramble on at will, sometimes on the subject, sometimes afield. This applicant who spoke little English and was unfamiliar with the American legal system was set adrift when it came time to present his own case.

This improper use of the interpreter is connected to a more important failure of the adversarial process, defense counsel's lack of communication with his client. Counsel testified that he had difficulty obtaining information from applicant even through the interpreter, during his jail visits. This failure presented an obvious handicap in preparing, especially, for the punishment phase of the trial. It was crucial during that phase for the defense to offer evidence in mitigation of the facts of the offense, evidence, particularly, that applicant would be no "continuing threat to society." Most relevant to that inquiry would be applicant's past behavior, but defense counsel learned little of applicant's background. "I couldn't," Dunn testified at the writ hearing. "I asked the questions, you know, where did you come from, what do you do now type thing. I got little information."

This lack of communication with his client left counsel in poor position to "meet the case of the prosecution." *Strickland,* 104 S.Ct. at 2063, citing *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942). When the State introduced evidence at the punishment phase of applicant's fight with another jail inmate—the only evidence the State offered during its case in chief on punishment—counsel was taken completely by surprise. He could do nothing to refute or explain the State's evidence.

Dunn's preparation for the punishment phase of trial consisted of securing the presence of the two witnesses of whom applicant had informed him and obtaining the testimony of Dr. Dickerson, the psychologist. As for the former, Dunn testified at the writ hearing, "I subpoenaed the people that he [applicant] gave me their names and I talked to those people in the hall prior to the punishment stage." This was insufficient preparation. It was obvious from his questioning of applicant's wife that he had little idea what her testimony would be.

Similarly, counsel seemed not to know how the psychologist, his own witness, would testify. He did not receive a written report from Dickerson after Dickerson's interview with applicant, and at the writ hearing Dunn testified that Dickerson's testimony was "a disappointment" to him, that as a witness the psychologist "was more of a burden to the defense than he was an asset ..." Why, then, was he offered as a defense witness? Presumably defense counsel hoped for better testimony from Dickerson but didn't know, when he offered the psychologist as a defense witness, *what* his testimony would be. "Witness preparation is vital to an effective defense presentation." *Ex parte Duffy*, 607 S.W.2d 507, 524 (Tex.Cr.App.1980), citing Moses, Criminal Defense Sourcebook. Defense counsel obviously failed in this regard.

He further adduced testimony from Dickerson that was at best irrelevant and at worst harmful, that people from "Latin cultures" refuse to take responsibility for their actions. Defense counsel Smith subsequently pointed out to the jury in argument that applicant fit that mold precisely, that he refused to take the responsibility for his actions. This position seems more indicative of future dangerousness than of any attitude that would lead the jury to believe there was a chance of applicant's rehabilitating himself if sentenced to life in prison.

We find on these facts that applicant has demonstrated that "counsel's performance was deficient." *Strickland*, 104 S.Ct. at 2064.

## VI.  PREJUDICE

We now consider the second prong of the *Strickland* standard, whether applicant's defense was prejudiced by the ineffective assistance of his counsel.

During the guilt phase of trial two eyewitnesses testified that applicant fired the shot that killed the deceased. One of those witnesses testified that applicant took the lead in stealing the deceased's car. It is doubtful in the face of this testimony that a different result would have obtained in spite of how well the defense presented its case. Certainly we cannot say there is a "reasonable probability" that absent counsels' errors the result of the guilt phase of trial would have been different.

The punishment phase is a different story, however.

When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury ... Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Strickland*, 104 S.Ct. at 2069.

In the instant case the evidence supporting the jury's finding that there was a

probability of applicant's future dangerousness, Art. 37.071(b)(2), V.A.C.C.P., was far from "overwhelming." Applicant was barely twenty years old at the time of the offense. He had a wife, two children with a third on the way, and an employment history in Dallas. More importantly, he had no criminal record. The State offered evidence that he was "violent and disruptive when crossed" during his incarceration while awaiting trial, but there was no evidence that applicant had ever been a danger to anyone prior to the instant offense. There was not even evidence of disruptive behavior in school such as was found to support the affirmative finding in *Kunkle v. State* (Tex.Cr.App. No. 69,501, delivered June 18, 1986). The only psychological testimony touching applicant's future dangerousness came from the defense witness, who testified that future dangerousness cannot be predicted with any degree of accuracy.

Nor would the facts of the offense itself support the finding that applicant would be a continuing threat to society. Even assuming, however, that the jury did consider the facts of the offense, as the State argued without objection that they should, those facts do not support a finding of future dangerousness. The murder was not a "calculated and cold-blooded crime," such as indicated a probability of future acts of violence in *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.App.1979). There was no indication that applicant and his companions planned to commit any crime at all when they arrived at the Exxon station. Applicant and one State's witness testified that applicant himself was very drunk and confused by events. At the time of the shooting the deceased was struggling with applicant's companion, trying to drag him from the car. Applicant fired one shot to stop him. The spontaneity of the crime is further witnessed by the fact that applicant left his own car behind at the scene, through which he could be, and was, easily traced by police. These facts show even less evidence of calculation than those of *Roney v. State*, 632 S.W.2d 598 (Tex.Cr. App.1982), in which this Court said,

> Although this was a senseless murder, that fact is true of every murder in the course of a robbery. [reference to *O'Bryan,* supra, omitted] To support a "yes" answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State*, 522 S.W.2d 934 [Tex.Cr.App.1975]; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [1976]. [emphasis in original]

*Roney,* supra, at 603.

In the instant case, when weighed against applicant's youth, his complete lack of a criminal history, and the facts of the uncalculated offense itself (even assuming those facts were before the jury as *punishment* evidence), the State's evidence to prove future dangerousness was extremely weak. This weakness of the State's case makes it all the more likely that defense errors contributed to the jury's affirmative findings on punishment.[5]

---

5. This is especially so in light of the fact that Dunn, who was appointed to represent applicant on direct appeal as well as at trial, did not during that direct appeal challenge the sufficiency of the evidence to support the affirmative finding to special issue number two. This Court has therefore had no previous occasion to review the sufficiency of that evidence. Applicant now claims that counsel's assistance on appeal was ineffective for his failure to raise a claim of ineffective assistance at trial. A better argument might be made that counsel was ineffec-

Beginning with the improper use of the interpreter, the defense was never prepared to meet the State's case. Applicant's version of the facts was presented in a paraphrased, rambling narrative, unguided by his counsel to address the specific facts of the offense. If applicant had been assisted in presenting his own version more forcefully, any lingering "residual doubt" that he was not the actual gunman in the killing would have operated in his favor on the question of future dangerousness. See *Lockhart v. McCree*, 476 U.S. 162, ——, 106 S.Ct. 1758, 1768–69, 90 L.Ed.2d 137, 153 (1986). At punishment, defense witnesses were unprepared to such an extent that applicant's own wife could not say whether her husband would "benefit" more by a sentence of life imprisonment than one of death, and counsel did not know what his psychologist witness's testimony would be. The breakdown in communication between counsel and client further led to a lack of investigation that left the defense unprepared to refute or mitigate the State's punishment evidence concerning army desertion and the fight with the other jail inmate.

The defense's case on punishment offered evidence that seems as likely to have led to the jury's answering special issue number two in the affirmative as anything the State offered. Defense "evidence" that applicant was a "wet-back" whose future behavior was unpredictable and who refused to take responsibility for his actions seems to have buttressed the State's case on punishment rather than refuting it. (Defense counsel himself agreed that his psychologist witness was "more a burden than an asset to the defense.") Given the weakness of the State's own case on punishment, defense counsel's errors caused a breakdown in the adversarial process sufficient to undermine confidence in the outcome.

We hold, therefore, that applicant was afforded ineffective assistance of counsel at his trial, and that his defense was prejudiced by that ineffective assistance. Though the errors affected the outcome of only the punishment phase of trial, we must remand for new trial so that punishment may be assessed by the same jury that decides guilt or innocence. *Evans v. State*, 614 S.W.2d 414, 417 (Tex.Cr.App. 1980); *Grijalva v. State*, 614 S.W.2d 420, 425 (Tex.Cr.App.1980).

The relief prayed for is granted. The judgment of the trial court is reversed, and applicant is remanded to the custody of the Sheriff of Navarro County to answer the indictment against him. A copy of this opinion shall be forwarded to the Department of Corrections.

W.C. DAVIS and TEAGUE, JJ., concur in result.

WHITE, J., dissents.

ONION, Presiding Judge, dissenting.

The real issue here, masked in disguise, is whether there was sufficient evidence to support the affirmative finding of the jury as to the issue of future dangerousness—the second special issue under Article 37.-071, V.A.C.C.P. Of course, this issue was not raised on direct appeal and this proceeding is a collateral attack—a post-conviction application for writ of habeas corpus. The applicant attacks the ineffective assistance of counsel at trial and on appeal, apparently not believing that an attack upon the insufficiency of evidence would prevail in a collateral attack. See and compare, however, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The majority, in order to reach a desired result, finds ineffective assistance of counsel at the penalty stage of the trial only.

tive on appeal for failure to claim the evidence was insufficient to support the finding of future dangerousness. Arguably this issue offered the best chance for reversal on direct appeal.

737

The conduct of counsel is belittled and "knocked about" in the majority opinion in order to soften up the reader for the final conclusion. Much of the language and inferences and innuendos, etc., in the majority opinion as to the effective assistance of counsel is totally unnecessary, and some is divorced from the reality of the facts with which appointed counsel had to work. It is much easier in the better light of hindsight to decide how the case should have been tried on behalf of the applicant. I dissent to reaching a result, however desirable, upon the basis that the majority does.

Before the court en banc.

## OPINION ON STATE'S MOTION TO DISMISS

MILLER, Judge.

On original submission applicant was granted the relief requested pursuant to Art. 11.07, V.A.C.C.P. and was remanded to the custody of the Sheriff of Navarro County to answer the indictment against him. *Ex parte Guzmon*, 730 S.W.2d 724 (Tex.Crim.App.1987). The State filed a motion for rehearing. On April 30, 1987, during the pendency of that motion, the Hon. William P. Clements, Governor of the State of Texas, entered his Executive Order commuting applicant's death penalty to life imprisonment.

All of the issues presented in the application for writ of habeas corpus relate only to errors occurring in the penalty stage of applicant's trial. Appellant's complaints go only to the imposition of the death penalty,

not the imposition of the alternative lesser punishment of life in prison. Once a defendant is found guilty of capital murder, punishment may only be assessed at death or life imprisonment. V.T.C.A. Penal Code, § 12.31. The Governor's order, therefore, has made the matter moot. See *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr.App.1982).

The relief requested by the applicant is denied.

DUNCAN, J., concurs in the result.

CLINTON, J., dissents based on the rationale of his dissenting opinion in *Adams v. State*, 624 S.W.2d 568, at 569 ff. (Tex.Cr.App.1981), and other opinions cited in Judge Teague's dissenting opinion in this case.

CAMPBELL, J., not participating.

TEAGUE, Judge, dissenting.

Former Chief Justice John Marshall of the United States Supreme Supreme Court, are you watching and listening? [1]

For Governor Bill Clements, and the members of the Executive Branch of our State Government which he heads, this Court's majority opinion should make for each of them a very happy day. For the citizens of this State, and the members of the Judicial Branch of our State Government, however, it should be a very sad moment because once again this Court destroys the faith that the voters of this State placed in the Judicial Branch of our State Government when they voted to enact Article II, § 1, of the Texas Constitution by ignoring its constitutionally imposed duties

[1]. For further reason why I commence this dissenting opinion with this question, and my reference to Chief Justice Marshall, see and read the historic decision of *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), that he authored on behalf of the United States Supreme Court, which decision stands today as the fundamental decision in the American system of Federal constitutional law. I am sad to report that I cannot refer the reader to a comparable decision on

State constitutional law by this Court. However, as will be seen, there are many decisions by this Court which, contrary to what Chief Justice Marshall did, reflect that this Court in recent times has abdicated its constitutionally imposed duties and responsibilities, which has relegated this Court and the other members of the Judicial Department of our State Government to be non-equals in the three part division of our State Government.

and responsibilities to the citizens of this State.

The record reflects the following:

On April 8, 1987, after finding that applicant, who had been convicted of capital murder and assessed the death penalty, was denied the effective assistance of counsel at the punishment stage of his trial, this Court ordered that applicant should receive a new trial on guilt as well as punishment.

On April 23, 1987, the State filed a motion for rehearing in this cause, and on May 1, 1987, the State filed a motion to dismiss based upon the fact that on April 30, 1987, while the State's motion for rehearing was pending this Court's acting on the motion, Hon. Bill Clements, Governor of this State, entered an Executive Order commuting Guzmon's death penalty sentence to life imprisonment.

I presume that this Court's original decision today had nothing whatsoever to do with Governor Clements' decision and that he would have issued the executive order even had this Court originally denied Guzmon any relief. It was just a matter of timing, I suppose.

Today, May 20, 1987, because of what Governor Clements has done, a majority of this Court declines to act on the State's motion for rehearing, and, furthermore, denies applicant any requested relief because the issue he presented, and on which this Court originally acted favorably towards him, are found to be moot because of Governor Clement's Executive Order of Commutation.

In debating with myself whether to file this dissenting opinion, or just a short note that I joined in the judgment of this Court because I was unable to persuade a majority of this Court that a purported grant of executive clemency by Governor Clements should not preclude this Court from discharging its constitutionally imposed duties and responsibilities on a case then pending before it, I finally opted to file this dissenting opinion so that those persons who follow in my judicial footsteps in the future will, hopefully, someday read in print where I, as one member of this Court, strongly believed, as did the people of this State when they voted to enact Article II, § 1, of the Texas Constitution, in the general concept of government that that provision of the Constitution announces, i.e., that the powers of our State Government are divided into three distinct departments, and that those of which are Legislative belong to that Department; that those of which are Executive belong to that Department; and that those of which are Judicial belong to that Department; and that no person, or collection of persons, being of one of these Departments, shall exercise any power properly attached to either of the others, except as provided by the Texas Constitution.

Today, once again, see *post*, the highest criminal court of our State Government holds that when a cause is lawfully pending before it, and is not yet finally decided, another branch of our State Government, the Executive, is permitted to step in and keep this Court from discharging its own constitutionally imposed duties and responsibilities, and thus make moot the issue that is before it to decide.

Without elongating this opinion, I will simply incorporate by reference all of what Judge Clinton has stated in the opinions that he has filed in the following causes, see *Rodriquez v. State*, 626 W.2d 35, 37 (fn. 3) (Tex.Cr.App.1981) *Adams v. State*, 624 S.W.2d 568, 569 (Tex.Cr.App.1981); *Clark v. State*, 627 S.W.2d 693, 627 (Tex.Cr.App.1982); and *Graham v. State*, 643 S.W.2d 920, 931 (Tex.Cr.App.1983), in which Presiding Judge Onion and I joined, regarding the doctrine of separation of powers of State Government, in which he so eloquently demonstrates that what this Court has done in the past, and what it does today, is a serious breach of the trust that the citizens of this State placed in the Judicial Branch of our State Government when they voted to enact Article II, § 1, of the Texas Constitution.