Opinion filed February 7, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed February 7,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-06-00185-CR 

                                                    __________

 

                                        RICKY MARTIN, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                          On
Appeal from the 70th District Court

 

                                                           Ector
County, Texas

 

                                                 Trial
Court Cause No. A-27,714

 



 

                                                                   O
P I N I O N

 

Ricky
Martin pleaded guilty to two counts of possession of a controlled substance and
elected to have the jury determine his punishment.  The jury assessed his
punishment at twenty years confinement and a $10,000 fine on count one and ten
years confinement on count two.  Martin appeals, contending that his counsel
was constitutionally ineffective.  Because Martin was not harmed by his trial
counsel=s actions, we
affirm.

                                                   Background
Facts








Martin
was indicted for two counts of possession of cocaine.  The first count alleged
that on May 5, 1999, Martin possessed four grams or more but less than two
hundred grams.  The second count alleged that on May 22, 1999, he possessed one
gram or more but less than four grams.  Martin pleaded guilty to both counts. 
He asked for a jury trial on punishment, and he filed an application for felony
community supervision.  The State advised the trial court that it would
introduce evidence of four unadjudicated offenses and that, pursuant to Section
12.45,[1] it would
dismiss them after trial.  Although Martin was not required to admit that he
was guilty of the four unadjudicated offenses as required by Section 12.45,[2]
his counsel successfully requested an instruction that the jury could consider
them only if the jury was convinced of Martin=s
guilt beyond a reasonable doubt.

At
trial, the State presented evidence that on May 5, 1999, Martin was stopped by
an Odessa police officer who recognized him and knew that his license had been
suspended.  The officer found 6.12 grams of crack cocaine during this stop.  On
May 22, 1999, while conducting a drug-related investigation at the Royal Inn,
Odessa police officers found marihuana and 2.93 grams of crack cocaine in a
room occupied by Martin and his girlfriend.








The
four unadjudicated offenses involved subsequent drug arrests.  On June 1, 2000,
Odessa police officers observed Martin deliver .19 grams of crack cocaine at
the Sahara Motel.  Two weeks later, on June 15, Odessa police received a tip
concerning drug trafficking at the Travel Inn, and they went to the motel to
investigate.  The tipster told police that Derek Pride was holding narcotics in
Room No. 108.  One officer went to the room and knocked on the door.  The
officer could hear movement inside the room, could smell marihuana, and could
hear a cabinet drawer or window open.  The officers ultimately gained access to
the room.  Martin and Pride were inside.  The officers searched the room and
noticed a large baggie with what appeared to be crack cocaine on the ground
outside the window.  They did not say anything about the baggie to Pride or
Martin but went outside and established surveillance.  Approximately ten
minutes later, they saw Martin stick his head out the window and point to the
bag.  Martin was arrested, and the police discovered 13.8 grams of crack
cocaine in two baggies outside the window.  They also found $1,243 in cash on
Martin.  Most of this was in twenties.  The significance of this, according to
the police, was that crack cocaine was selling for $20 a rock.

On
July 18, Martin was observed at the Desert Inn engaged in suspected drug
trafficking.  A police officer approached Martin and received consent to search
his motel room.  During this search, officers found a baggie with 6.45 grams of
crack cocaine.  Finally, on August 8, shortly before the start of his trial on
the 24th, Martin was arrested for selling 1.08 grams of crack cocaine to an
undercover officer. 

In
addition to the six drug arrests, the State also presented evidence that Martin
was arrested for possession of 77.3 grams of crack cocaine while on community
supervision as a juvenile, that he had been arrested several times for driving
without a license, and that he resisted arrest during the August 8 incident.

                                                             Issues

Martin
raises two ineffective-assistance-of-counsel issues.  First, he contends that
his trial counsel was ineffective for not objecting to a probation officer=s testimony that Martin
would not be a good candidate for community supervision and that he would not
want Martin on his caseload.  Second, he contends that trial counsel=s closing argument
alienated the jury and cast further disdain upon him.

                                                              Standard
of Review








To
prevail on a claim of ineffective assistance of counsel, an appellant must
establish that his lawyer=s
performance fell below an objective standard of reasonableness and that there
is a Areasonable
probability@ the
result of the proceeding would have been different but for counsel=s deficient performance.  Strickland
v. Washington, 466 U.S. 668, 693‑94 (1984); Mallett v. State,
65 S.W.3d 59, 62‑63 (Tex. Crim. App. 2001).  A reasonable probability is
a probability sufficient to undermine confidence in the outcome. Hernandez
v. State, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986).  The purpose of this
two‑pronged test is to judge whether counsel=s conduct so compromised the proper
functioning of the adversarial process that the trial cannot be said to have
produced a reliable result.  Thompson v. State, 9 S.W.3d 808, 812‑13
(Tex. Crim. App. 1999) (citing McFarland v. State, 845 S.W.2d 824,
843 (Tex. Crim. App. 1992)). The review of defense counsel=s representation is highly
deferential and presumes that counsel=s
actions fell within a wide range of reasonable professional assistance. Tong
v. State, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Appellant must
overcome the presumption that, under the circumstances, the challenged action
might be considered sound trial strategy. Jackson v. State, 877 S.W.2d
768 (Tex. Crim. App. 1994); Hayden v. State, 155 S.W.3d 640, 648 (Tex.
App.CEastland 2005,
pet. ref=d).

                                                                        Analysis

The
Probation Officer=s
Opinion Testimony.  

Martin=s trial counsel called Chad
Hetrick, an Ector County Felony Probation Officer, as a witness.  Hetrick
testified about the rules and conditions applicable to probationers, and he
testified that there are people on community supervision in Ector County who
were convicted of drug possession, drug delivery, and sex crimes.  During the
State=s
cross-examination, Hetrick testified that he had not seen anyone placed on
community supervision with three pending cases.  The State then solicited the
following opinion testimony:

Q: 
And if someone has six pending drug cases, would you recommend that person for
probation?

 

A: 
With six pending?  No, sir.  I couldn=t
do that just from my opinion.  No, sir.

 

Q: 
And if someone was indicted on two cases and then commits other ones, does that
indicateBwhat does
that indicate to you about their likelihood of success?  Or how promising they
are?

 

A: 
Not very promising.  Low probability.

 

Q: 
And would you feel comfortable taking someone that had been indicted and then
went out and committed the same offense?

 

A: 
I don=t know if
comfortable is the word.  I would, my expectation level would be very low.

 

Q: 
And if someone has been on probation before and messed up, does that also
effect the likelihood of their success on probation?

 

A: 
Yes, sir, it can.  It shows an effort, that their effort wasn=t very good before.  It=s kind of to be expected. 
Or performance is not very good.

 

.
. . .

 

            Q: 
What about if you were asked to put somebody on probation that had committed a
similar crime for the one that you were putting them on probation for two weeks
prior to that, would that give                        you concern?

 

            A: 
Oh, yes, sir.

 

            Q: 
What if they had done two of those in the past month, month and a half, would
that concern you even more?

 

            A: 
Yes, sir.

 

            Q: 
What about if they had done four in the past six months?  Past three months?

 

            A: 
Yes, sir.  I would like to know all of that.     

 

            . .
. .

            

            Q: 
It doesn=t sound like
somebody that you would want on your caseload?

 

            A: 
No, sir, not at all.  It kind of keeps probation from being a catchall
situation.

 

Martin
contends that his counsel was constitutionally ineffective for not objecting to
this opinion testimony, relying upon Mares v. State, 52 S.W.3d 886, 893
(Tex. App.CSan Antonio
2001, pet. ref=d). 
There, the San Antonio Court held that defense counsel was constitutionally
ineffective for not objecting to a probation officer=s testimony that in his opinion the defendant
was not a good candidate for community supervision.  The court noted that trial
counsel=s sole
strategy was to obtain a probated sentence, concluded that this strategy was
not served by failing to object, and found, therefore, that counsel was
constitutionally ineffective.  Id.  Martin concludes that, because his
trial counsel=s only
strategy was to obtain community supervision, the failure to object constitutes
ineffective assistance of counsel.  There may be instances in which sound
strategy would not require an objection to a probation officer=s opinion, such as where
counsel decides not to emphasize a minor statement, but we agree with the San
Antonio Court that in this instance no discernable trial strategy was served.








However,
before we can find that counsel was constitutionally ineffective, we must first
consider whether the failure to object was harmful.  Harm exists when there is
a reasonable probability that, but for counsel=s
unprofessional error, the result of the proceeding would have been different.  In
re M.S., 115 S.W.3d 534, 549-50 (Tex. 2003).  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  Thompson,
9 S.W.3d at 812.  Our review must consider the totality of the evidence.  A
verdict or conclusion only weakly supported by the record is more likely to
have been affected by errors than one with overwhelming record support.  Ex
parte Guzman, 730 S.W.2d 724, 734 (Tex. Crim. App. 1987).

In
Mares, the court found harm because of the emphasis placed upon the
probation officer=s
testimony by the prosecution during closing argument.  52 S.W.3d at 893.  Mares
had a prior conviction for aggravated assault with a deadly weapon and was
convicted of sexual assault.  The probation officer described both offenses as
violent crimes and then testified that, in her opinion, someone who had
previously been on probation for aggravated assault would not be a good
probation candidate for a sexual assault offense.  Id.  The prosecution
emphasized this testimony during closing argument, pointing out to the jury
that the probation officer was an expert; that, in her opinion, the defendant
was not a good candidate for probation; and that she was essentially telling
the jury not to place the defendant on probation.  The prosecutor then asked
the jury to follow the officer=s
advice because of her expertise.  Id.  

Hetrick=s opinion testimony was far
more substantial than was offered in Mares.  But, the State=s reliance upon it was far
less substantial.  The State pointed out in closing argument that Martin had
pleaded guilty to two drug offenses and that, during the pendency of his
indictment for them, he committed four other drug offenses within a three-month
time span.  The State then referred to Hetrick=s
testimony and said:  AYou
have heard the probation department say they don=t
like this -- the most that they have is three cases and they laid it all out
for you.@  The
prosecutor made no other reference to Hetrick=s
testimony.  








The
potential for harm in Mares was apparent because the defendant was
sentenced to ten years confinement and, therefore, was eligible for probation.[3] 
52 S.W.3d at 888.  The jury, however, denied his probation request.  Id.
at 893.  It is logical to conclude that the jury relied upon the probation
officer=s testimony to
deny probation, particularly when that testimony was so strenuously emphasized
by the prosecution.  In this case, however, we cannot say that the jury relied
upon Hetrick=s
testimony because the jury did not reach Martin=s
request.  Martin was sentenced to twenty years confinement.  Consequently, he
was not eligible for community supervision.[4] 
Furthermore, in light of the overwhelming evidence of Martin=s past criminal behavior,
testimony that he was not a good candidate for community supervision was hardly
persuasive.  Finally, because the jury gave Martin the maximum permissible
period of incarceration and the maximum permissible fine for a second degree
felony, it is clear that probation was not a consideration.  Martin was not
harmed by trial counsel=s
failure to object.  His first issue is overruled.

Trial
Counsel=s
Closing Argument.

Martin
next argues that his trial counsel was ineffective during closing argument
because counsel alienated jurors and cast further disdain upon him.  The State
opened and emphasized that Martin was a drug dealer; that he had been
repeatedly arrested for drugs; that he was given an opportunity as a juvenile
to straighten up but did not do so; and that, even though he was under
indictment, he was still committing crimes until shortly before the start of
trial.  The State concluded by arguing that Martin was a curse to the community
and no longer belonged there.  In response, Martin=s counsel began his closing argument by
saying:

We
don=t want Ricky
Martin in this society.  We don=t
want him mingling with the child molesters on probation.  And we don=t want him mingling with
the sex offenders on probation.  We don=t
want him mingling with people that have shot people who are on probation.  That
have committed violent offenses and are on probation.  We don=t want that.

 

We
want him to mingle with rapists, with robbers.  We want to throw him away like
that trash.  Like that.  You know.

 

Let
someone treat him like a punk, you know.  You got a pretty mouth.  Is that what
we want?  We want years and years of that.

 

. . . . 

 

Okay. 
What are we going to do with him?  Are we done with him?  Do we throw him away
like trash?  You know, trash goes somewhere and doesn=t come back.  We give up on this piece of
trash, on this animal.  This disgusting, nothing.

 








He is
coming back.  Coming back to this city.  He=s
going to be released to here when he gets out.  You want him back? 

 

. . . .

 

You
know, he=s trash and
he needs to be in there and not out here on probation.  You know, we can=t have that because we
reserve that for sex offenders.  Does that make sense?

 

You
know, look at him.  He=s
18.  Look. This is as pretty as I can make him.  I couldn=t even get his mom up here
to come testify, you know.  She gave up on him.  Do we?  Look.  F--k him.  Let
him get raped.

 

The trial court
intervened and asked trial counsel to Ahold
it down.@  Martin=s counsel then continued:

Yes,
sir.  He had his chance.  He=s
18.  He=s worthless. 
He=s trash.  He should
get raped.  We should forget about him.  Let him get raped and brutalized.

 

If
we are lucky he just learns when he joins a gang in prison to get protected and
he makes some really good contacts.  He learns how to be the high level drug
dealer.  He meets the big time criminals now.  He makes connections.  And that=s if we are lucky.  He
comes out of prison knowing the real players.  Knowing the real drug dealers. 
He comes out of prison knowing how fun it is to rape little girls.

 

The State
objected, and the trial court sustained the objection and instructed counsel to
Amove on.@  Martin=s counsel then stated:

You
know what he=s going
to learn in prison.  You know what type of people that there are in prison.

 

Do
we want that thing that is so worthless now that we can=t even give him a chance, that is so pathetic,
that is such a piece of trash that we can=t
even give him a chance today, do we want him back out here after having been
subjected to this?  Is that better for society?  Is that the right thing to do
to give up right now?

 

You
know, that is the easy thing to do.  I mean, it=s
funny but the easy thing to do is send someone to prison sometimes.

 

You
know, there=s going to
be some people there in the jury box that say, well, he sold drugs.  He is a
drug dealer.  They need to go to prison.  Maybe they do.

 








You
know, if he had decided to snitch people off he wouldn=t be here.[5] 
As bad and as trashy as he is, if he had of decided to do that he wouldn=t be here.

 

You
know, as dangerous, as vile, as worthless as he is, if he had worked for them
it would have been all right regardless of what he does.

 

Well,
he is not that dangerous.  He is helpless.

 

The
reason that I brought the probation officer up here is for y=all to understand the type
of people that are on probation.

 

The
type of people that are on probation are criminals.  They have committed bad
acts.  They are bad people.  It=s
not us that are on probation.  It=s
not people like me and like you that are on probation.  It=s people like Ricky that
are on probation.  

 

. . . .

 

Drugs
are rotten and he=s
done rotten things and has lived a rotten life.  And he is 18.  But he hasn=t raped little girls.  He
hasn=t shot people. 
He hasn=t beat people
up.  He hasn=t
assaulted people.  He hasn=t
done those things.  Which is worse?

 

Somehow
because he=s 18 and
just went, you know, kind of C
what do you expect?  You saw his mom selling drugs, being involved in drugs. 
She got more upset because they mentioned her boyfriend=s name than anything that has happened to
Ricky.

 

You
know, she didn=t even
bother to C she was
bringing his clothes.  Was the reason that we were late yesterday.  She didn=t even bother to show up to
testify today.

 

I
didn=t think to
subpoena her but I should have.  You know, you wouldn=t think that you would need to subpoena
somebody=s mother.

 

You
know sometimes there=s
a reason people turn out rotten. . . .

 

Probation. 
What can we do?  Is he somebody that we just cannot help on probation? 

 

. . . .

 








First
of all, Ricky is going to have to get a job other than this job, you know.  If
he doesn=t have a job
and he=s able to and I
promise that he is able to, he can get revoked.

 

If
he hangs around those people that you heard about, that=s another rule of probation. . . . 

 

. . . .

 

If
he tests dirty for drugs, keeps smoking that marijuana.  They will pee test
you. . . .

 

            . . . .

 

If
he commits another crime, if gets another one of these, I can guarantee you he=s going to prison. . . .

 

            . . . .

 

What
it comes down to is, what is going to serve society best?  What is the best
thing tomorrow?  You know, a month from now, five years from now?

 

Let
him be supervised by probation officers.  Let them try to teach him something.
. . .

 

. .
.  I just ask that you give the probation office, this Court, a chance to do
something before we admit failure. 

 

. . . .

 

And
he=s not a piece of
trash.  He=s not an
animal.  He is a stupid, idiot kid.  He has never known anything but this.  He
was never told by his mother this isn=t
the way that you live.

 

. . . .

 

If
[probation officers] can make a difference, if they are making a difference, if
they had made a difference, I ask y=all
to give them a chance to make a difference with Ricky.  With an 18 year old. 
Who is eligible for probation.  That was the stipulation.

 

I
just ask that you give them a chance.  If he fails it, he fails it.  But give
them a chance, give him a chance.








We
have quoted large portions of counsel=s
argument in an effort to place the challenged statements in context.  It is
difficult for an appellate court to fully appreciate the impact of a closing
argument because we are limited to a review of the record.  What counsel says
is important.  The record illuminates us with this.  But, how it is said is
vitally important because the tone and manner of delivery can significantly
impact the message conveyed, particularly in instances such as this where
counsel was clearly attempting to use sarcasm.  The record fails to provide us
with this critical information and, therefore, makes it difficult for us to
determine the effect of counsel=s
argument on the jury.

The
use of sarcasm or a dramatic shocking statement at the beginning of a closing
argument can be sound trial strategy.  The jury heard eight police officers and
one probation officer testify that Martin was a crack dealer with a bad reputation. 
Some police officers even described him as  more than a street dealer, but as a
mid or upper level dealer.  The jury knew that Martin had been arrested six
times as an adult for selling crack cocaine and that his last arrest was two
weeks before trial.  They knew that he failed probation as a juvenile because
of an arrest for selling crack cocaine.  The State=s overwhelming evidence that Martin was a
career drug dealer with little regard for the law and that he was selling
thousands of dollars of crack cocaine in the community undoubtedly weighed
heavily against any consideration of probation.  Counsel=s challenge was to overcome the perception
that Martin was a threat to society and to convince the jury to consider him as
a person and view him as someone worthy of a chance at rehabilitation.  That
challenge called for a dramatic closing argument.








But
if counsel=s strategy
was appropriate, his execution was not.   The State concedes that counsel=s attempt at sarcasm was Abeyond the pale.@  Texas courts have held
that counsel=s
prejudicial references to his own client can constitute ineffective
assistance.  See, e.g., Ex parte Guzman, 730 S.W.2d at 726 (referring to
client as a Awet-back@); see also Ramirez v.
State, 65 S.W.3d 156, 157 (Tex. App.CAmarillo
2001, pet. ref=d)
(counsel told jury during closing argument that he did not want them to
perceive his client Aas
a drunk Mexican@). 
Texas courts have also held that offensive conduct by counsel can constitute
ineffective assistance.  See, e.g., Miller v. State, 728 S.W.2d 133, 135
(Tex. App.CHouston
[14th Dist.] 1987, pet. ref=d)
(counsel referred to complainant, who was from Nigeria, as Aa man swinging from limb to
limb with a banana or coconut in one hand@).

The
distinction between these cases and the one before us is the contrast between
the challenged conduct and the remainder of the trial.  For example, in Guzman,
730 S.W.2d at 725-27, 730-31, trial counsel repeatedly and intentionally
referred to his client as a Awet-back.@  In Ramirez,
counsel affirmatively introduced evidence that his client was an illegal alien,
raised no objection when the State inquired into the extent of his client=s drinking B even though there was no
evidence that alcohol played a part in the incident, and then used and allowed
the State to use a racial slur to describe his client.  65 S.W.3d at 157-58. 

In
this instance, Martin complains of his counsel=s
references to him as Atrash@ and Athis disgusting nothing@ and of his statements, AF--k him.  Let him get
raped.@  When the
entirety of counsel=s
closing argument is considered, it is clear that he did not think his client
was trash nor did he want the jury to do so.  Instead, he was attempting to
utilize a dramatic opening to his argument to overcome the effect of the State=s overwhelming evidence and
to convince the jury that his client was a person, that he deserved another
chance, and that placing him on probation instead of sending him to prison
provided the best opportunity to salvage a life worth saving. 








When
counsel=s plea for
probation is contrasted with the entire record, it is clear that he was not
engaged in a pattern of offensive conduct but was desperately trying to obtain
one last chance for a defendant with a poor track record.  During voir dire, he
prepared the panel to consider probation for an individual guilty of multiple
drug offenses.  He verified that jurors could consider probation, and he
successfully challenged those for cause who indicated that they could not do
so.  He told potential jurors that people who were guilty of very serious
offenses, including murder, were on probation, and he explained how probation
worked.  During his opening statement, counsel contended that probation was a
viable option because of the services and programs available, that Martin was
eligible for probation, and that this would be his one and only chance. 
Counsel advised the jury that he would be Aforceful@ about this being Martin=s one last chance.  During
trial, counsel vigorously cross-examined each of the State=s witnesses, and he
obtained the full benefit of Section 12.45 by having four unadjudicated
offenses dismissed without Martin having to admit to them.  In fact, he
successfully obtained a reasonable doubt instruction when the first evidence of
an unadjudicated offense was introduced.

Counsel
could have utilized more professional language during closing argument and
should have been more mindful of the trial court=s
admonitions.  Whether that falls below an objective standard of reasonableness,
we need not decide because, when the record is viewed as a whole, we cannot say
that counsel=s poor
choice of language was harmful.  Martin received incarceration because of his
own conduct and not because of his counsel=s
closing argument.  Martin=s
second issue is overruled.

                                                                        Holding

            The
judgment of the trial court is affirmed.

                                                                              

 

RICK STRANGE

JUSTICE

 

February 7, 2008

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









     [1]Tex. Penal Code Ann. ' 12.45 (Vernon 2003).





     [2]Section 12.45
provides in part: 

 

(a) A person may, with the consent of the attorney for
the state, admit during the sentencing hearing his guilt of one or more
unadjudicated offenses and request the court to take each into account in
determining sentence for the offense or offenses of which he stands adjudged
guilty.

 

(c) If a court lawfully takes into account an admitted offense,
prosecution is barred for that offense.





     [3]Tex. Code Crim. Proc. Ann. art. 42.12, ' 4 (Vernon Supp. 2007).





     [4]Article 42.12, ' 4(d)(1).





     [5]This was a
reference to one of the State=s witnesses,
Jesse Saldana.  The State agreed to dismiss a prostitution charge against
Saldana if he agreed to help the police Amake
a case.@  Saldana helped arrange the August 8 drug buy.