Affirmed and Opinion filed April 20, 2006









Affirmed
and Opinion filed April 20, 2006.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00184-CR

____________

 

HUGO STEVE RAMIREZ, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 337th
District Court

Harris County, Texas

Trial Court Cause No. 993,401

 



 

O P I N I O N

Appellant Hugo Steve Ramirez appeals after
a jury found him guilty of assault on a public servant.[1]  In his sole point of error, appellant alleges
that he was denied effective
assistance of counsel in violation of his state and federal rights.  We affirm.

Factual Background 

On July 6, 2004, three uniformed officersCOfficer Chad Cook, Officer Gary
White, and Officer April Armstrong, all of the Pasadena Police DepartmentCwere dispatched to appellant=s house to investigate a reported
domestic disturbance.  Appellant=s next-door neighbor, Kirk Dillard,
had called 911 after witnessing a fight between appellant and his wife, Lisa
Coody.  All three officers testified that
when they arrived, they heard furniture falling inside the house, a person
being slapped or struck, and Coody screaming for help.  The officers also heard appellant threatening
to kill Coody.

Cook testified that he announced APasadena Police@ and the officers drew their
weapons.  As Cook stepped forward into
appellant=s open front doorway, the door
bounced back forcefully and hit him. 
After stepping around the door, Cook saw appellant inside the
house.  Cook testified that appellant
attempted to punch him, but that he dodged the punch and pushed appellant to
the floor.  Cook further testified that
as he was reholstering his gun, appellant struck him, knocking his glasses off
and scratching his face.  According to
Cook, appellant then ran down the hallway. 
Cook pursued appellant and quickly wrestled him into handcuffs.  The testimony of White and Armstrong
corroborated Cook=s account.

The officers described appellant=s behavior as Acrazy and wild,@ Aextremely violent,@ and Apumped up.@ 
Cook and White also testified that appellant was very sweaty, that his
muscles were extremely rigid, and that he alternated between screaming and
laughing after being arrested.  Cook
stated that appellant appeared to be under the influence of a substance that
made him extremely angry, and White, a drug recognition expert, testified that
appellant acted as if he had taken a stimulant. 


Cook further testified that appellant repeatedly threatened
to harm Cook=s family.  According to Cook, appellant also stated that
he often beat Coody and that she was afraid of him.  Similarly, Armstrong testified that appellant
threatened her and Cook when they attempted to remove his jewelry during the
booking process.  Armstrong also
testified that appellant made various references to Voodoo.








Procedural Background

Appellant was charged with assault on a public servant.  He retained Cedrick Muhammad, a criminal
defense attorney, on September 28, 2004. 
On December 13, 2004, Muhammad received notice that appellant=s trial would begin on February 7,
2005.  On January 25, 2005, Muhammad
filed ADefendant=s Notice of Expert Witnesses,@ informing the State that he intended
to call appellant=s psychiatrist, Dr. Gentil Salazar.  On February 2, Muhammad filed a motion for
continuance.  In the motion, Muhammad
alleged that appellant had Abecome impossible to communicate with@ and stated:  AI believe my client is suffering from
a chemical or mental imbalance at this time, and I=m not confident in his ability to
assist me in the preparation or trial of his cases [sic] at this time.@ 
The trial court denied the motion the same day, and appellant=s trial began as scheduled on
February 7. 

Despite his prior notice to the State, Muhammad did not
subpoena Dr. Salazar to appear on February 7. 
In fact, Muhammad did not issue any subpoenas until February 8, the
second day of trial; at that time, Muhammad issued subpoenas for Dr. Salazar as
well as Robert Barfield and Jeff Larson, who were appellant=s friends.  However, these subpoenas apparently were
never served, and the witnesses who testified on appellant=s behalf did so at appellant=s request.

Defense Evidence and Closing Argument at
Guilt/Innocence Phase








 Seven defense
witnesses testified at the guilt/innocence phase.[2]  Robert Barfield, a municipal judge and friend
of appellant=s family, testified that he had never
seen appellant behave violently, even under stress, and was surprised when he
learned of the charges against appellant. 
Next, Coody testified that appellant=s behavior had never prompted her to
call 911.  Coody also testified that on
the night in question, she had an anxiety attack, which caused her to black out
at the front door; Coody stated that she probably received the scratches on her
body when she fell.  While she could not
recall many details, Coody testified that she woke up in the master bedroom and
saw several officers trying to subdue appellant in the living room.  Coody also testified that appellant took
Adderol.[3]  Clay Kennedy, who had known appellant for
twelve years and studied martial arts with him, testified that appellant was
very skilled in martial arts and had great respect for authority.  On cross-examination, despite the prosecutor=s statement that appellant had bitten
a police officer while evading arrest in 1992, Kennedy testified that his
opinion of appellant=s character had not changed. 
Appellant=s mother, Doris Ramirez, testified that appellant=s behavioral problems began when he
was a year old, that appellant had seen many doctors over the years, including
Dr. Salazar, and that appellant was currently under psychiatric care.  Appellant=s mother also testified that she
often bought appellant=s medicine and had recently purchased Adderol for appellant=s Attention Deficit Disorder
(ADD).  According to his mother,
appellant behaved normally as long as he took his medication properly, but
became hyper and agitated when he failed to do so.[4]

In his closing argument, Muhammad reasoned that Awith [appellant=s] size and martial arts training,@ both Coody and Cook would have been
injured more seriously if appellant had 
truly intended to hurt them.  He
also commented that both Coody and appellant suffered from psychiatric
disorders and blamed the incident on  Aa lack of proper medication.@ 
Muhammad also emphasized various witnesses= testimony that appellant typically
did not behave violently.  The jury found
appellant guilty of assault on a public servant.

Evidence and Arguments at Punishment Phase

At the punishment phase, Lieutenant Jack Fry of the Pasadena
Police Department testified for the State. 
Fry had arrested appellant in 1992 for causing a disturbance in a fast
food restaurant.  According to Fry, when
appellant learned that he was under arrest for disorderly conduct, he tried to
escape.  Fry testified that appellant
swung at him and then jumped behind the wheel of his car; when Fry reached into
the car to turn off the engine, appellant shifted the car into drive.  According to Fry, appellant drove through the
parking lot with Fry clinging to the side of the car.  Fry also testified that appellant bit his
arm, leaving a bruise.  On cross-examination,
Fry testified that while appellant originally had been charged with a felony,
the charge ultimately was reduced to a misdemeanor for evading arrest.

The State also called Jacqueline Shea, the Office of Court
Services employee who interviewed appellant shortly after his arrest in July
2004.   Shea testified that appellant Ahad a chip on his shoulder@ and was Avery cocky.@ 
According to Shea, appellant did not mention that he took medication or
had any medical problems; however, appellant informed Shea that he was taking
anabolic steroids.  On cross-examination,
Shea testified that appellant was agitated and unfocused on her questions, even
though the interview lasted only fifteen minutes.  Shea also testified that appellant seemed
normal.








Three witnesses testified on appellant=s behalf at the punishment
phase.  First, appellant=s mother testified that appellant had
begun to exhibit problems at the age of six months and that he was a hyper and
nervous baby.  Appellant=s mother also testified that
appellant had attended a special high school run by psychiatrists and had spent
six months in a mental hospital. 
Furthermore, appellant=s mother testified that appellant had been in psychiatric care
all his life and had always needed medication for his ADD; however, she stated
that appellant Afunction[s] very, very well@ when he takes his medication.  Appellant=s mother testified that if the judge
sentenced her son to probation, she would remind him to take his medication
properly.  Finally, appellant=s mother characterized her son as a Avery productive citizen@ who Aworks like crazy@ and helps disadvantaged people.

Tobie Lee Miles, appellant=s former girlfriend, testified that
appellant was a Astand-up guy@ who always treated her very well and A[did] more than any normal guy would
for you.@ 
Miles also stated that appellant had never hit her.  Finally, Miles testified that she and
appellant were contemplating a future together and that she would help oversee his
medication.[5]

Finally, Kennedy, appellant=s long-time friend, testified that he
would oversee appellant=s  medication and help
him complete his probation successfully. 
Kennedy also believed that appellant would be supported by a strong
family structure.  Kennedy testified that
appellant was not a danger to society, that he functioned normally when taking
his medication properly, and that he helped people financially.  On cross-examination, Kennedy conceded that a
Agood guy@ respects authority and does not beat
women or mislead them romantically. 
Kennedy also agreed that generally speaking, people are more likely to
do bad things when those who care about them are not present.  Kennedy also testified that appellant had
obtained a prescription for steroids from his doctor.  On redirect examination, Kennedy testified
that appellant was a responsible person who liked to help people.








In his closing argument, Muhammad mentioned that appellant
was taking several medications for Ahis mental illness.@ 
Muhammad further argued: AIf a person is on medication and on
[sic] psychiatric care all of his life, there=s something wrong.  When he=s not medicated properly, he has a
reaction.  But you have a host of people
who are willing to make sure he takes the proper medication at the proper time.@ 
Consequently, Muhammad asked the jury to assess a punishment of probation.

In his closing argument, the prosecutor expressed concern
that the jury Amight have been bamboozled a little
bit about this mental illness thing@ and argued that Athere was absolutely no evidence that
[appellant] ingested any stuff in the guilt/innocence phase of this trial.@ 
The prosecutor characterized Coody=s testimony as a Aweak assertion that [appellant] may
not have been taking Adderol, which is for attention deficit, hyperactivity
disorder@ and 
emphasized the absence of testimony from a psychiatrist, pharmacist, or
other medical expert. The prosecutor further asserted that no expert testified
because the opinion would have been disfavorable to appellant; he also argued
that appellant=s alleged psychological problem had
not prevented him from running a successful business.  Finally, the prosecutor argued that appellant
behaved disrespectfully toward women and police officers, and he requested that
the jury assess a punishment of at least four years= confinement in the
penitentiary.  The jury assessed
punishment at seven years= probation and a $10,000 fine, and the judge sentenced
appellant accordingly.

Motion for New Trial








On March 3, 2005, appellant filed a motion for new trial,
alleging ineffective assistance of counsel. 
In his affidavit, appellant stated that Muhammad appeared to be
disinterested and did not work diligently on his case; appellant also believed
that Muhammad Awas not going to be adequately
prepared when the case had to the [sic] tried.@ 
Appellant also stated that in December 2004, roughly two months before
trial, he had given Muhammad a list of nine witnesses who could testify on his
behalf.  According to appellant, these
witnesses could testify about (1) medication he was taking at the time of the
incident; (2) his  character for
non-violence and his respect for police officers; (3) his sparring and fighting
capabilities; and (4) his history of non-violence in his relationships with
women, including Coody.  Appellant
claimed that as of January 25, Muhammad had made no effort to contact any
witnesses.[6]

Appellant further alleged that on January 27, 2005, he gave
Muhammad a revised witness list, which included fourteen additional witnesses
who could speak to the same issues as the original nine.  According to appellant, Muhammad said that he
would contact and subpoena the witnesses prior to trial.  Appellant also stated that he gave Muhammad a
copy of a letter from Dr. Salazar and informed Muhammad that the doctor could
testify Aas to the medications that I was
taking at the time of the incident that led to my arrest, and how those
medications affected my perception and behavior during the incident.@ Appellant further claimed that when
he went to Muhammad=s office on February 5, 2005, Muhammad seemed distracted and
discussed appellant=s case for only thirty or forty-five minutes.  According to appellant, Muhammad said not to
worry about going to trial in two days because the case was going to be re-set
again.  Appellant stated that he was
shocked when the trial commenced on February 7 and that he frantically
telephoned witnesses because Muhammad had not subpoened anyone.  According to appellant, Muhammad subpoened
three witnesses on the second day of trial only after appellant confronted
him.   Appellant also alleged that
although Muhammad knew that appellant wished to testify in his own defense, he
prevented him from doing so.  Finally,
appellant stated that Muhammad produced no mitigating evidence at the
punishment phase of trial. 








 The affidavits of Clay
Kennedy and appellant=s parents corroborated appellant=s account.  Kennedy stated that he had always expected to
testify on appellant=s behalf but did not know the case was going to trial on
February 7 until appellant telephoned him that day.  Kennedy also stated that Muhammad did not
discuss his testimony with him prior to calling him as a witness and asserted
that Muhammad Adid not have a clue as to what I could
testify to or what questions to ask me.@ 
Kennedy ultimately opined that Muhammad was Acompletely unprepared for trial . . .
and did not have a clear idea of what to say on [appellant=s] behalf.@ 
Appellant=s father stated that his son had not expected to go to trial
on February 7; he also testified that Muhammad never spoke to him before
calling him to the witness stand and seemed Aconfused . . . about what he was
trying to do with [appellant=s] case.@  Appellant=s mother stated that she first spoke
with Muhammad in the hallway outside the courtroom on February 7 and that
Muhammad Aseemed very unprepared for [appellant=s] trial.@ 
All three affiants stated that Muhammad and appellant had argued about
Muhammad=s reluctance to issue various
subpoenas.  

Finally, appellant=s motion for new trial also included
a letter from Dr. Salazar, dated January 26, 2005.  In the letter, Dr. Salazar stated that he had
been treating appellant for Attention Deficit and Hyperactivity Disorder (ADHD)
since appellant was six years old and that appellant had been Adoing quite well as a person.@  Dr. Salazar asserted that on July 4, appellant
uncharacteristically consumed alcohol while he was taking Dexedrine and
explained that this combination can lead to erratic and even psychotic
behavior.  According to Salazar, the
combination of Dexedrine and alcohol caused appellant=s aggressive behavior on July 6.  

Hearing on Motion for New Trial








On May 5, 2005, the trial court held a hearing on appellant=s motion for new trial.  Dr. Salazar testified that he was appellant=s psychiatrist and had known him
since birth.  Dr. Salazar stated that he
had prescribed Dexedrine, a stimulant, to appellant, and that appellant had
been taking it for many years.  Dr.
Salazar also confirmed that he had written a letter on appellant=s behalf and reiterated that the
combination of Dexedrine and alcohol caused appellant=s unusual behavior, although he
acknowledged that the Dexedrine label would contain warnings about alcohol
consumption.  Dr. Salazar also confirmed
that he was not served with a subpoena until after the trial had begun and that
he never spoke with Muhammad or an investigator about appellant.  On cross-examination, Dr. Salazar stated that
he was unaware that appellant had been charged with assault on a public servant
in 1992 and assault involving a family member in 1997.  He also testified that appellant never
admitted to striking Officer Cook, hitting Coody, or threatening the other
officers, and agreed that a proper diagnosis is not possible if a patient does
not tell the entire truth.

Muhammad testified that he received notice about appellant=s trial date on December 13,
2004.  He denied telling appellant on
January 25 that the case would be postponed and stated that both he and
appellant were prepared to go to trial on February 7.  Muhammad also insisted that he filed the
motion for continuance on February 2 because appellant had become impossible to
communicate with and Muhammad was uncertain that appellant could assist him in
preparing a defense.[7]








Muhammad also testified that appellant=s mother had faxed two witness lists,
but that the first did not indicate the content of their potential
testimony.  Although Muhammad stated that
he did not receive either list until after trial began, he asserted that he
knew that the character witnesses would generally say positive things about
appellant.  Muhammad also testified that
he did not believe the court would allow him to call so many character
witnesses and that he was reluctant to call witnesses who would be subject to
impeachment based on their knowledge of appellant=s prior assaults.  Muhammad testified that before trial,
appellant informed him that he had secured witnesses who could testify about
his character for non-violence toward police officers, but he denied that
appellant mentioned  witnesses who could
testify about his character for non-violence in general or his relationship
with Coody.  Muhammad also testified that
he learned during the week of trial that Kennedy could testify about appellant=s physical capabilities and martial
arts training.  

Muhammad further testified that appellant said his girlfriend
could testify about the medication appellant had taken on the night of the
assault and its effects, and he denied that appellant mentioned Dr. Salazar as
a potential witness regarding any substances appellant had taken that
night.  Although Muhammad acknowledged
that he had received Dr. Salazar=s letter prior to trial and had
designated Salazar as an expert witness on January 27, Muhammad stated that he
had expected Dr. Salazar to testify about the Apossible mental state of [appellant]
overall, not to what drugs he took that night, which he had no knowledge of.@ 
Muhammad stated that although he and appellant=s family telephoned Dr. Salazar, the
psychiatrist would not return their phone calls.  Muhammad acknowledged that he never spoke
with Dr. Salazar or made arrangements to pay for his testimony.








Muhammad explained that he did not subpoena any witnesses
before trial because appellant had assured him that he could secure the
witnesses= attendance; furthermore, Muhammad
was reluctant to subpoena cooperative witnesses because doing so provided
notice to the state.  Muhammad also testified
that he reviewed the State=s file and did not contact Cook himself because in his
experience, police officers are generally unwilling to discuss a pending case
with defense counsel.   He denied arguing
with appellant about his failure to subpoena witnesses and stated that he
issued the three subpoenas on February 8 because appellant had failed to secure
the witnesses as promised.   Muhammad
stated that he learned during the week of trial that Kennedy could testify about
appellant=s physical capabilities and martial
arts training, and that he obtained sufficient information by speaking with
defense witnesses in the hallway during trial.[8]  He also testified that he had spoken with
some witnesses over the telephone and had discussed the case with appellant and
his parents before trial, although he could not remember everything he had done
to prepare for appellant=s case.

According to Muhammad, appellant never expressed a desire to
testify on his own behalf.  Muhammad
testified that he told appellant they would discuss the issue when the time
came but that  Aultimately I would make the decision.@ 
According to Muhammad, when he told appellant that he was not going to
testify, appellant responded with silence, which Muhammad interpreted as Aratification.@ 
Muhammad testified that he initially planned to call appellant to the
stand but later changed his mind. Muhammad explained that he had represented
appellant in several prior criminal matters, including two assaults, and he
believed that appellant had a prior conviction. 
Muhammad also testified that the facts suggested voluntary intoxication,
which is not a defense to assault on a public servant.  Muhammad did not remember telling the jury
that appellant had not taken his medication and explained that his strategy
evolved as the case unfolded.[9]  

Prosecutor John Craig Still testified that while he disagreed
with Muhammad=s trial strategy, he thought that
Muhammad conducted effective cross-examination of the police officers.  He also testified that appellant had numerous
dismissals and acquittals but no convictions on his record.  Still also expressed disappointment that
appellant was sentenced to probation instead of serving time in the
penitentiary.








Defense attorney Brett Ligon testified that defense counsel
should communicate with witnesses and prepare them in advance of trial.[10]  According to Ligon, speaking to witnesses for
the first time during breaks in the trial would fall below professional norms,
although he conceded that character witnesses did not require the same degree
of preparation as eyewitnesses.  Ligon
acknowledged that he typically would not subpoena friendly witnesses in hopes
of surprising the prosecution; however, he stated that relying on a client to
secure a witness that the attorney had not also contacted would fall below
professional norms.  Ligon also opined
that failure to consult with a designated expert witness and to research their
credentials would fall below professional norms.  Ligon also testified that the client
ultimately should decide whether to testify in his own defense.

The court denied appellant=s motion for new trial on May 5,
2005. On appeal, appellant alleges that Muhammad=s representation fell below the
prevailing professional norms for a reasonable defense attorney practicing in
Harris County, Texas by: (1) failing to interview and secure the attendance of
necessary witnesses; (2) failing to prepare adequately for trial; (3) failing
to allow appellant to testify; and (4) failing to present mitigating evidence
at the punishment phase.

Standards of Review

We review a trial court=s ruling on a motion for new trial
under an abuse of discretion standard.  Charles
v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).  When, as here, the motion alleges ineffective
assistance of counsel, we must determine whether the trial court=s determination of the ineffective
assistance claim and denial of the motion for new trial were clearly wrong and
outside the zone of reasonable disagreement. 
Freeman v. State, 167 S.W.3d 114, 116-117 (Tex. App.CWaco 2005, no pet.).[11]








The two-pronged standard of review for a claim of ineffective
assistance of counsel is well-established and applies to both the
guilt/innocence and punishment phases of trial.   Strickland v. Washington, 466 U.S.
668, 687 (1984); Hernandez v. State, 988 S.W.2d 770, 770 (Tex. Crim.
App. 1999); Milburn v. State, 15 S.W.3d 267, 269 (Tex. App.CHouston [14th Dist.] 2000, pet. ref=d). 
The appellant must prove ineffective assistance by a preponderance of the
evidence.  Jackson v. State, 973
S.W.2d 954, 956 (Tex. Crim. App. 1998).

First, the appellant must demonstrate that counsel=s representation fell below an
objective standard of reasonableness under prevailing professional norms.  Strickland, 466 U.S. at 687; Hernandez,
988 S.W.2d at 770.  The appellant must
show that Acounsel made errors so serious that
counsel was not functioning as the >counsel= guaranteed the defendant by the
Sixth Amendment.@  Strickland,
466 U.S. at 687.  There is a strong
presumption that counsel rendered effective assistance.  Id. at 690.  When evaluating the effectiveness of counsel,
an appellate court looks to the totality of the representation and the
particular circumstances in each case.  Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

Secondly, the appellant must establish that counsel=s performance was so prejudicial that
it deprived appellant of a fair trial.  Strickland,
466 U.S. at 686; Hernandez, 988 S.W.2d 
at 770.  To establish prejudice,
an appellant must show that a reasonable probability exists that, but for
counsel=s unprofessional errors, the result
of the proceeding would have been different. 
Strickland, 466 U.S. at 694. 
A reasonable probability is a probability sufficient to undermine confidence
in the outcome.  Id.

Failure to Interview and Secure Attendance of
Necessary Witnesses

In his first point of error, appellant argues that Muhammad
rendered ineffective assistance by failing to interview and subpoena Dr.
Salazar as well as the character witnesses on appellant=s two lists.  We disagree.








Counsel=s failure to call witnesses at the guilt/innocence or
punishment phases is irrelevant absent a showing that the purported witnesses
were available and that their testimony would have benefitted the appellant.  King v. State, 649 S.W.2d 42, 44 (Tex.
Crim. App. 1983).  Furthermore, the
appellant must overcome the presumption that, under the circumstances of the
case, counsel=s contested actions may be considered
sound trial strategy.  Strickland,
466 U.S. at 690.  Strategic and tactical
decisions are virtually unchallengeable when made after thorough investigation
of the facts and law.  Id.

At the hearing on the motion for new trial, Muhammad
testified that Dr. Salazar had no knowledge of the drugs appellant might have
taken on July 6.  Furthermore, according
to Muhammad, appellant stated that Coody could testify about the substances
appellant had taken on the night of the assault.  Muhammad also testified that he adjusted his
trial strategy because the facts of appellant=s case suggested voluntary
intoxication, which is not a defense to assault.  Muhammad also explained that he did not
subpoena friendly witnesses before trial because appellant had assured him that
he could secure their attendance. 
Muhammad stated that he did not try to interview Cook because he did not
believe the officer would discuss the case. 
Muhammad also testified that he spoke with several character witnesses
before trial but decided not to interview all of them because their testimony
would be cumulative. 








 In light of Muhammad=s testimony, appellant has failed to
prove that the testimony of the absent witnesses would have benefitted
him.  Appellant has failed to show that
Dr. Salazar=s testimony would have benefitted him
because Dr. Salazar had no personal knowledge of the drugs or combination of
substances that appellant might have taken on the night of the assault.  Furthermore, because voluntary intoxication
is not a defense to assault, Dr. Salazar=s testimony on that point would have
been irrelevant.  See Tex. Pen. Code Ann. ' 8.04(a) (Vernon 2003) (stating that A[v]oluntary intoxication does not
constitute a defense to the commission of a crime@). 
Similarly, appellant has failed to prove that the testimony of
additional character witnesses would have benefitted him.  Presumably, any additional witnesses simply
would have echoed the opinion that appellant was essentially a good person,
rendering their testimony cumulative. 
Accordingly, we hold that Muhammad=s performance was not deficient in
this respect.  See also Hale v. State,
140 S.W.3d 381, 392  (Tex. App.CFort Worth 2004, pet. ref=d) (counsel was not ineffective for
failing to investigate and interview defense witnesses in child molestation
case who would testify that they had never seen the defendant act
inappropriately with children and that children never appeared to be afraid or
uncomfortable around defendant); Tutt v. State, 940 S.W.2d 114, 121
(Tex. App.CTyler 1996, pet. ref=d) (counsel will not be considered
ineffective for failing to call every witness requested by a defendant,
especially if the witnesses= testimony would be cumulative); Turner v. State, 932
S.W.2d 622, 625 (Tex. App.CHouston [14th Dist.] 1996, no pet.) (counsel not ineffective
for failing to call any character witnesses when character witnesses knew
nothing of the facts of the assault and could testify only about defendant=s good reputation for truth and
peacefulness).  

Even if Muhammad=s representation fell below an
objective standard of reasonableness in this respect, we cannot say that
appellant was prejudiced.  There is not a
reasonable probability that the outcome of the trial would have been different
but for Muhammad=s failure to call Dr. Salazar and additional character
witnesses because there is substantial evidence that appellant assaulted
Officer Cook, and again, voluntary intoxication is not a defense to
assault.  Furthermore, even though the
prosecutor requested the jury to sentence appellant to Ano less than four years@ in jail, the jury assessed a
punishment of only seven years= probation and a fine. 
See Green v. State, 829 S.W.2d 938, 939  (Tex. App.CFort Worth 1992, no pet.) (defendant
was not harmed when the jury assessed a punishment significantly lower than
that requested by the State); Rumph v. State, 687 S.W.2d 489, 494 (Tex.
App.CHouston [14th Dist.] 1987, no pet.)
(defendant was not harmed when the jury assessed a punishment of probation
instead of time in the penitentiary).  We
overrule appellant=s first point of error.

Inadequate Trial Preparation

In his second point of error, appellant argues that Muhammad
rendered ineffective assistance because he did not adequately prepare the
testifying witnesses and because he failed to discuss appellant=s potential testimony and the issues
relevant to his defense.  We disagree.








 First, Muhammad
testified that he spoke with appellant several times prior to trial, and
appellant stated in his affidavit that he came to Muhammad=s office.  There is no evidence in the record to support
appellant=s accusation that Muhammad did not
discuss his defense other than appellant=s own statements.  Because there is a conflict on this point, we
must defer to the trial court=s judgment.  See
Jones, 2004 WL 231309 at *8.  Accordingly, we hold that appellant
has failed to overcome the presumption of competence on this point. 

Regarding the allegedly inadequate preparation of his defense
witnesses, appellant relies on Guzmon v. State, 730 S.W.2d 724, 734
(Tex. Crim. App. 1987), in which the Court of Criminal Appeals remarked that
counsel=s assistance was ineffective when he
met in the hallway with the two witnesses who testified on appellant=s behalf at the punishment stage
immediately before the punishment stage began. 
The court noted that it was obvious from counsel=s questioning of the defendant=s wife that he did not know what her
testimony would be.  Id.  Similarly, the court noted that counsel
seemed unaware of how his own expert witness would testify and highlighted
counsel=s testimony at the hearing on the
writ of habeas corpus that the expert=s testimony had been Aa disappointment@ and Awas more of a burden to the defense
than it was an asset.@  Id.  Furthermore, the court stressed that the
expert=s testimony that people from ALatin cultures,@ like the defendant, Arefuse to take responsibility for
their actions@ was Aat best irrelevant and at worst
harmful@ to the defendant.  Id. 









Assuming without deciding that Muhammad=s representation fell below an
objective standard of reasonableness, we hold that Muhammad=s preparation of defense witnesses
did not prejudice appellant.  Muhammad
testified that he had spoken with appellant and his parents before trial and
felt that he had adequately prepared all the defense witnesses= testimony.  Additionally, although he learned about Kennedy
only during the week of trial, Muhammad did not appear to be surprised by
Kennedy=s testimony or the other witnesses= testimony.  More importantly, unlike the cases upon which
appellant relies, none of the defense witnesses at either the guilt/innocence
or the punishment phases said anything that harmed appellant; rather, their
testimony portrayed appellant as a productive, non-violent person who behaved
normally when he took his medication properly. 
Finally, as discussed above, appellant received only probation and a
fine instead of jail time as punishment. 
We overrule appellant=s second point of error.

Failure to Allow Appellant to Testify 

In his third point of error, appellant complains that
Muhammad rendered ineffective assistance by refusing to allow him to testify on
his own behalf.[12]  We disagree.

The only evidence in the record that appellant ever informed
Muhammad of his desire to testify is appellant=s statement to that effect.  Muhammad stated that he initially planned to
put appellant on the stand but later changed his mind because he thought that
appellant had a prior conviction. 
Muhammad also testified that appellant never expressed a desire to
testify and remained silent when Muhammad told him that he would not be
testifying.  Muhammad interpreted
appellant=s silence as ratification.  In light of the discrepancies between
appellant=s and Muhammad=s accounts, we must again defer to
the judgment of the trial court.  We
cannot say that Muhammad=s representation fell below professional norms by not
allowing appellant to testify.  We
overrule appellant=s third point of error.

Failure to Present Mitigating Evidence

In his final point of error, appellant alleges that
during the punishment phase, Muhammad did not present mitigating evidence on
the issue of appellant=s prescription medication and its effects
on his behavior.  We disagree.








As discussed above, Muhammad=s decision not to
call Dr. Salazar did not constitute ineffective assistance.  Furthermore, the testimony of the other
defense witnesses, particularly appellant=s mother, relayed
to the jury that appellant needed medication and behaved normally when he took
it properly.  Appellant refers this court
to our decision in Milburn v. State, 15 S.W.3d 267, 271 (Tex. App.CHouston [14th
Dist.] 2000, pet. ref=d), in which we held that defense counsel=s failure to
present mitigating evidence was prejudicial and amounted to ineffective
assistance.  In that case, counsel
presented no mitigating evidence whatsoever, despite the availability of
friends and family to testify.  Id.
at 270.  In appellant=s case, however,
witnesses testified that they would help ensure that appellant was properly
medicated and also characterized him as a hard-working, productive person.   Clearly, Milburn and appellant=s case are
distinguishable on that basis.  Appellant
has produced insufficient evidence to overcome the presumption that Muhammad
rendered competent assistance. 
Therefore, we overrule appellant=s final point of
error and affirm the judgment of the trial court.

 

 

 

/s/      Adele
Hedges

Chief Justice

 

 

 

 

Judgment rendered
and Opinion filed April 20, 2006.

Panel consists of
Chief Justice Hedges and Justices Yates and Guzman.

Do Not Publish C Tex. R. App. P. 47.2(b).











[1]  The jury
recommended and the judge imposed a sentence of seven years= probation and a $10,000 fine. 





[2]  Muhammad
presented five new witnesses and recalled Officers Cook and Armstrong.





[3]  Muhammad also
asked Coody if appellant Ahas any type of emotional condition,@ why appellant took Adderol, whether Coody Aover[saw] [appellant] taking any medications,@ and A[w]hat happens when [appellant] doesn=t take [Adderol].@  The trial court sustained the State=s objections to these questions.





[4]  The trial
court held a bench conference after the State objected to Muhammad=s questioning Ms. Ramirez about appellant=s behavioral problems and his medication.  The State argued that Ms. Ramirez=s testimony was hearsay and that she did not qualify
as an expert witness.  Muhammad responded
that he Ajust  wanted to
show [appellant=s] overall mental condition@ and that Ms. Ramirez=s
testimony was based on conditions and reactions that she had observed Aas a mother.@





[5]  The record
indicates that Coody and appellant had cohabited for several years and that
appellant considered her to be his wife. 
At the time of appellant=s trial, Coody had moved out of their shared residence;
however, she testified that she and appellant were engaged.  Meanwhile, Miles testified that she and
appellant had recently reconnected and were seriously contemplating a future
together.  Miles further testified that
to her knowledge, appellant and Coody were no longer a couple.





[6]  Appellant
appeared in court on January 25, at which time the case was re-set for February
7.





[7]  Muhammad
testified that he was not satisfied with appellant=s ability to assist in his defense and that it was
important to obtain a medical opinion on the matter.  However, according to Muhammad, the trial
court indicated that appellant=s bond would be revoked if a psychological examination
took place.   Seeking to avoid revocation
of appellant=s bond, Muhammad testified that he recommended that
appellant be allowed to see his private psychiatrist instead; the trial court
was unpersuaded and denied the motion for continuance.  Although appellant complained of the lack of
a competency hearing in his motion for new trial, he does not address this
issue on appeal.

 





[8]  Kennedy=s name did not appear on either of the two witness
lists appellant provided.





[9]  We note that
in his opening statement at the guilt/innocence phase, Muhammad indicated that
appellant had not been taking his medication on the night of the assault.  However, for the remainder of the trial,
references to appellant=s medication involved appellant=s taking it properly.





[10]  Appellant
contacted Ligon after the first day of trial to express his dissatisfaction
with Muhammad=s representation.





[11]  In an
unpublished opinion, the Court of Criminal Appeals reaffirmed the abuse of
discretion standard for review of a trial court=s ruling
on a motion for new trial.  See State
v. Jones, No. 678-02, 2004 WL 231309, *8 (Tex. Crim. App. Jan. 28, 2004)
(not designated for publication).  The
court further noted that despite the abuse of discretion standard, reviewing
courts are not bound by the trial court=s legal
conclusion on the issue of ineffectiveness, and they may independently decide
the issue while still granting deference to the trial court=s findings on subsidiary fact issues.  Id.





[12]  Appellant also
claims that Muhammad=s failure to allow him to testify violated certain of
his rights under the federal and state constitutions and the Code of Criminal
Procedure.  However, appellant argues
ineffective assistance of counsel as his sole point of error on appeal, and his
analysis pertains only to that issue.