Opinion issued June 24, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-08-00934-CR &
01-08-00935-CR

———————————

Jeremiah Addon Curry, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 248th District Court 

Harris County, Texas



Trial Court Case No. 1122699 & 1165117

 



 

MEMORANDUM  OPINION

          A
jury convicted appellant, Jeremiah Addon Curry, of two charges[1] of aggravated robbery.[2]  The jury assessed punishment at 25 years’
imprisonment and a fine of $5,000 for one offense and 40 years’ imprisonment
and a fine of $10,000 for the other offense, both sentences to run
concurrently.  In three issues, appellant
argues: (1) that the evidence was legally insufficient to establish his guilt;
(2) that the evidence was factually insufficient to establish his guilt; and
(3) that he was denied effective assistance of counsel.

          We
affirm.

BACKGROUND

          On
the night of June 25, 2007, the complainants, Lakisha Roberts and Antoinette
Breed, who had lived together for four years, were in their apartment in
Baytown, Texas with Roberts’ ten-year-old son Kailen Arceneau, Roberts’ two-
year-old god-daughter Daniesha, and Lakeisha Brown, Roberts’ niece.[3] The complainants and Kailen
were in one bedroom watching a movie, Daniesha was in the other bedroom asleep,
and Brown was in the living room watching television.  Between midnight and 1:00 a.m., there was a
“loud knock” at their door.  After
hesitating, Roberts went to the door.  The
door did not have a peephole, but a person on the other side of the door identified
himself as “Mike.”  Roberts opened the
door and almost immediately thereafter was struck with the handle of a gun.  Five people—three men and two women—burst
into the apartment and ordered everyone to be quiet and to get on the
floor.  The intruders wore black bandanas
over their faces, but Roberts and Kailen recognized one of them as their next
door neighbor, Isaiah Thomas.  Appellant
entered the bedroom where Breed and Kailen remained, pointed a gun at Breed,
and ordered them into the living room.   


The intruders used duct tape to
restrain, to silence, and to blindfold the complainants.  After the complainants were restrained and
silenced, the intruders beat them.  Kailen,
who remained on a couch during the entire event, was unrestrained and not
blindfolded.  

          After
the complainants were restrained and silenced, appellant and his accomplices
began to search the apartment.  As they
did so, Roberts and Breed heard Thomas address appellant by his first name,
Jeremiah, and they heard appellant reply. 
Roberts then heard appellant speak with Kailen.  Later, during the robbery, Roberts heard
appellant report that Roberts’ god-daughter, two-year-old Daniesha, was still asleep.  Breed heard appellant ask where the
complainants had hidden their guns and money. 
After remaining in the apartment for twenty or thirty minutes, appellant
and his accomplices prepared to leave. 
Before they left, Breed and Roberts heard appellant state that they
should take a waterfall picture from the wall. 
In addition to the waterfall picture, appellant and his accomplices took
a flat-screen television, keys, a DVD player, a VCR, a PlayStation 2 game
console, cellular phones, jewelry, and children’s clothing.  As he left the apartment, appellant threatened
the complainants, stating, “You better not call the police because if you call
the police we will be back for you.”  

After appellant and his accomplices
had left the apartment, Roberts and Breed freed themselves, closed the
apartment door, and found an old cell phone.  Breed dialed 911 from the bedroom.  Although the cell phone continually
disconnected from emergency services, the police were dispatched to the
complainants’ apartment.  

When the police officers arrived at
the complainants’ apartment, Breed identified two of the intruders, Derrick Tillis and Isaiah Thomas, by name.[4]  After speaking with the officers, Roberts
discovered that her new car had been scratched severely and its four tires
punctured.  Between 30 minutes and an
hour after the officers arrived at the complainants’ apartment, the police
officers transported the two complainants, Kailen, Daniesha, and Brown to the
police station for formal statements.  There,
Roberts and Breed related the details of the robbery and then identified appellant
as one of the robbers.

The police officers interviewed the
complainants separately for approximately an hour.  During the interview, Breed told S. Latta,
the interviewing detective, that appellant had been among those who had robbed
her and that appellant had “put a gun in [her] face.”  The detective showed Breed a photo spread, from
which she identified Tillis as one of the men who had robbed her.  Both complainants later identified appellant
in a photo lineup.  The State obtained
two indictments against appellant, one for the armed robbery of Lakisha Roberts
and one for the armed robbery of Antoinette Breed.  The indictments both alleged that appellant
used or exhibited a handgun during the commission of the theft.  The cases were tried together.  

At trial, the State called eleven
witnesses, and the defense called appellant, who testified briefly outside the
presence of the jury as
to whether he had committed a prior offense.

Roberts
testified that late in the evening she was watching television with Breed,
Kailen, and Lakeisha, when they heard a knock on the door from someone who
identified himself as “Mike.”  She opened
the door and something hit her across her right eye.  Someone told her, “Shut the f___ up and get
down on the ground.”  She recognized
Thomas as the person who struck her, whereupon he struck her again.  Although his face was covered by a black
bandana, she could still see his eyes and hair. 
When Roberts got down on the floor, Thomas duct-taped her hands behind
her back and duct-taped her eyes.  As she
lay on the floor, she recognized the voices of Tillis and appellant and hearing
Isaiah ask appellant, “Hey, Jeremiah, do you want to take the computer?”  Appellant said that it would be too
complicated to unhook everything, and it was not taken.  Roberts was afraid for her life.   

Roberts
testified that appellant and Thomas were brothers and both had been living in
the apartment next door to the complainants with Laura Fernandez, Thomas’s girlfriend,
until Fernandez was evicted a few days before the robbery.[5]   Thomas, Tillis, and appellant were still
living there at the time of the robbery. 
She knew appellant through Thomas, and prior to the robbery she had
spoken to appellant five or six times.  She also testified that, in the days
before the robbery, she had purchased a new Ford Escape.  Her previous car had been destroyed in an
accident shortly before the robbery, and her insurance company paid her
$3,000.  She had told Thomas and
appellant before the robbery that she had a new car and that she had received
money from her insurance company.  

Breed
testified that she heard the commotion and came into the living room and that appellant
shoved a gun into her face and told her to “get on the living room floor.”  She recognized appellant, whom she knew
through Thomas, “[b]ecause of his even fade [hair style] and thick
eyelashes.”  Her blindfold did not cover
one of her eyes, and she observed the entire robbery.  She saw Isaiah and appellant walk into her
bedroom.  She also heard Thomas address appellant
by his first name, Jeremiah; she heard appellant respond to Thomas’s use of his
name, and she heard appellant ask where the money and guns were hidden.  When appellant returned to the living room, he
hit her in the head twice with the butt of his pistol.     

Kailen testified that he was not
blindfolded and that he recognized Thomas because Thomas lived in the apartment
next door. 

Brown likewise testified to the
details of the crime.  She testified that
she saw Roberts get hit on the head and fall to the floor.  She heard the name “Isaiah” called out.  She was then duct-taped.  She could not identify any individuals.  She testified that all of the male intruders carried
guns, but that the women did not.  She
was “stomped on the head” by one of the females. 

Officer W. Pentecoste, a police
officer who responded to the complainants’ emergency call, testified that, in
his brief conversation with the complainants, he asked them about the gender,
race, and general physical descriptions of the robbers and radioed this
information to officers on patrol.  

Officer M. Burdick of the Houston
Police Department testified that, on February 13, 2008, he attempted to stop
appellant because the motorcycle that appellant was riding was without a front
light, but appellant did not stop.  Eventually,
appellant stopped the motorcycle, dropped it on its side, and fled on foot.    Appellant
was located hiding in a closet in a house nearby.  Officer Burdick eventually arrested appellant
for an outstanding warrant for armed robbery and also charged him with evading
arrest.

The jury convicted appellant on both
charges of armed robbery.  At the
punishment phase, a witness testified for the State that appellant had
committed an extraneous aggravated robbery on May 2, 2004, by stealing the
witness’s dirt bike while Isaiah Thomas wielded a gun.  The jury assessed punishment at 40 years’
imprisonment for the robbery of Breed and 25 years’ imprisonment for the
robbery of Roberts.  Appellant did not
file a motion for a new trial. This appeal followed.  

ANALYSIS

I.     
Legal and Factual Sufficiency of the Evidence

In his first and second issues,
appellant contends that the evidence was legally and factually insufficient to
sustain the verdict against him. 
Specifically, appellant challenges the legal and factual sufficiency of
the State’s evidence to prove his identity as the robber because, he contends,
the complainants had only limited interaction with him before the robbery,
there was nothing distinctive about his voice, and, while his brother used his
first name, Jeremiah, during the robbery, there was no last name used.  In addition, he contends that the evidence was
factually insufficient because there was no other evidence such as “DNA,
weapon, fingerprint, telephone call, or co-conspirator confession” to tie him to
the crime.

A.   Standard of Review

In a legal-sufficiency review, we
consider the entire trial record to determine whether, viewing the evidence in
the light most favorable to the verdict, a rational jury could have found the
accused guilty of all essential elements of the offense beyond a reasonable doubt.
 See
Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); Evans v. State, 202 S.W.3d 158, 161
(Tex. Crim. App. 2006); Vodochodsky v.
State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005).  The jurors are the exclusive judges of the
facts, the credibility of the witnesses, and the weight given to the testimony.
 Margraves
v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  A jury is entitled to accept one version of
the facts and to reject another, or to reject any part of a witness’s
testimony.  Id.  In conducting our review
of the legal sufficiency of the evidence, we do not reevaluate the weight and
credibility of the evidence, but ensure only that the jury reached a rational
decision. Muniz v. State, 851 S.W.2d
238, 246 (Tex. Crim. App. 1993).  

When conducting a factual-sufficiency
review, we view all of the evidence in a neutral light.  Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).  We will set the verdict aside only if (1) the
evidence is so weak that the verdict is clearly wrong and manifestly unjust or
(2) the verdict is against the great weight and preponderance of the evidence.  Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  Under the first prong of Johnson, we cannot conclude that a conviction is “clearly wrong” or
“manifestly unjust” simply because, on the evidence before us, we would have
voted to acquit had we been on the jury. Watson
v. State, 204 S .W.3d 404, 417 (Tex. Crim. App. 2006).  Under the second prong of Johnson, we cannot declare that a conflict in the evidence
justifies a new trial simply because we disagree with the jury’s resolution of
that conflict.  Id. Before determining that evidence is factually insufficient to
support a verdict under the second prong of Johnson,
we must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Id.  The jury is in the best position to evaluate
the credibility of witnesses, and we are required in our factual-sufficiency
review to afford “due deference” to the jury’s determinations.  Marshall
v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).  In conducting a factual-sufficiency review,
we must also discuss the evidence that, according to the appellant, most
undermines the jury’s verdict.  See Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  

B.   Analysis

Appellant was charged with the aggravated
robberies of Roberts and Breed. The elements of aggravated robbery that must be
proved are that a person committed a robbery and that he caused serious bodily
injury, used or exhibited a deadly weapon, or placed another person in fear of
imminent bodily injury or death.  Tex. Penal Code Ann. § 29.03 (Vernon 2003).

The
identity of the person committing the offense is an element of the crime that
must be proved.  See Greene v. State, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st
Dist.] 2003, pet. ref’d) (holding that identity is element of offense and that
it may be proven by direct or circumstantial evidence).  Courts have found voice identification
alone to be legally and factually sufficient to establish the identity of the
perpetrator of a crime.  McInturf v. State, 544 S.W.2d 417, 418–19 (Tex. Crim. App. 1976) (holding that voice
identification constituted direct evidence of identity when complainant had one
30 minute encounter with appellant); Davis
v. State, 180 S.W.3d 277, 286 (Tex. App.—Texarkana 2005, no pet.) (holding
that complainant’s voice identification of appellant was legally and factually
sufficient to support conviction when complainant had one 15 minute encounter
with appellant).[6]  Sight identification, likewise, may be both
legally and factually sufficient to establish identity.  Johnson
v. State, 176 S.W.3d 74, 78 (Tex. App.—Houston [1st Dist.] 2004, pet.
ref’d) (holding eye-witness identification was factually-sufficient to support
conviction when complainant saw appellant only on night that he robbed her, but
she testified that she recognized him by his eyes); Walker v. State, 180 S.W.3d 829, 832–33 (Tex. App.—Houston [14th Dist.] 2005, pet. ref’d) (holding
identification by only one eye-witness was legally and factually sufficient to
support conviction when the appellant robbed complainant at gunpoint and
robbery lasted less than one minute).

The complainants testified that
they recognized appellant’s voice during the robbery, that during the 20 to 30
minutes the intruders were in the apartment appellant spoke several times, that
in the weeks preceding the robbery they had spoken with appellant numerous
times, and that they had last spoken with him “a couple of days” before the
robbery.  Breed and Roberts also testified
that they heard Thomas, whom they knew to be appellant’s brother, address
appellant by his first name, Jeremiah, and that they heard appellant reply to
his brother.    

In addition to the voice
identification, Breed testified that she recognized appellant by his haircut
and eyelashes.  Breed recognized
appellant when he came to get her out of the bedroom at gunpoint and moved her
to the living room, where he restrained and blindfolded her.  Because her blindfold covered only one eye,
Breed watched as appellant robbed her apartment and then walked over and struck
her on the head with a gun.  Breed and
Roberts later identified appellant in a photo lineup that the police presented
to them, as well as in court.  

We conclude that, viewing the
evidence in the light most favorable to the verdict, a rational jury could have
found that appellant committed the crimes of aggravated robbery with which he
was charged.  See Evans, 202 S.W.3d at 161. 
We further conclude that, viewed neutrally, the evidence is not so weak
as to render the verdict clearly wrong and manifestly unjust and the judgment
is not against the great weight and preponderance of the evidence.  See
Johnson, 23 S.W.3d at 11.  We hold
that Breed’s and Roberts’ identification of appellant as one of the robbers is
both legally and factually sufficient to support his conviction for armed
robbery. 

We overrule appellant’s first and
second issues.

INEFFECTIVE ASSISTANCE

In his third issue, appellant
argues that he was denied the effective assistance of counsel during both the
guilt-and-innocence and the punishment phases of his trial.  Appellant contends that he received
ineffective assistance due to his counsel’s courtroom behavior, the way that counsel
examined witnesses, and his decision to call appellant’s sister.  He contends that appellant’s counsel
“antagonized both the Judge and Jury” with “needless and incorrect objections,”
“engaged in a dialogue that needlessly aggravated the court before the jury,”
and “opened the door to a state’s witness[’s] opportunity to recite extraneous
offenses” by asking Officer Burdick, who arrested appellant, “a thoughtlessly
open-ended question.”  Appellant further
claims his counsel was ineffective at the punishment stage by making “frivolous
objections” to incriminating audio tapes played by the State, by calling
appellant’s sister to the stand, since she had been on the motorcycle when
appellant turned it over and fled and was pinned under it, and by making
improper sidebar statements in closing arguments.  

A.   Standard of Review

To prevail on a claim of
ineffective assistance of counsel, an appellant must show that his trial
counsel’s performance was deficient and that a reasonable probability exists
that, but for the deficiency, the result of the proceeding would have been
different.  Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S. Ct. 2052,
2064, 2068 (1984).  The first prong of
the Strickland test requires that the
defendant show that counsel’s performance fell below an objective standard of
reasonableness.  Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). This
does not require a showing that counsel’s representation was without
error.  See Robertson v. State, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).  Nor do isolated errors render counsel’s
performance ineffective.  Id.  “When
handed the task of determining the validity of a defendant’s claim of
ineffective assistance of counsel, any judicial review must be highly
deferential to trial counsel and avoid the deleterious effects of
hindsight.”  Thompson, 9 S.W.3d at 813.  The
second prong of Strickland requires
that the defendant show a reasonable probability that, but for his counsel’s
unprofessional errors, the result of the proceeding would have been different.  See
Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Thompson, 9 S.W.3d at 812.  Because
the reviewing court must indulge a strong presumption that counsel’s conduct fell
within the wide range of reasonable professional assistance, the defendant must
overcome the presumption that, under the circumstances, the challenged action
“might be considered sound trial strategy.” Strickland,
466 U.S. at 689, 104 S. Ct. at 2065.  An
appellate court must begin its review with a strong presumption that trial
counsel’s actions fell within the wide range of reasonable representation and
that the actions constituted sound trial strategy.  McFarland
v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).  A specific trial strategy may be deemed
inadequate representation only if counsel’s actions are without any plausible
basis.  Ex parte Burns, 601 S.W.2d 370, 372 (Tex. Crim. App. 1980).

Any allegation of ineffectiveness
must be firmly founded in the record, which must affirmatively demonstrate the
alleged ineffectiveness.  Thompson, 9 S.W.3d at 813 (citing McFarland, 928 S.W.2d at 500).  We will not speculate to find trial counsel
ineffective when the record is silent on counsel’s reasoning or strategy. See Jackson v. State, 877 S.W.2d 768,
771 (Tex. Crim. App. 1994); Gamble v.
State, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.).  In rare cases, however, the record can be
sufficient to prove that counsel’s performance was deficient, despite the
absence of affirmative evidence of counsel’s reasoning or strategy.  See
Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000).  Such cases are limited to occasions when no
reasonable attorney could have made such a decision.  Weaver
v. State, 265 S.W.3d 523, 538 (Tex. App.—Houston [1st Dist.] 2008, pet. ref’d).

B.   Analysis

Appellant complains about incidents
in the record that reflect unfavorably on his counsel. However, he fails to
acknowledge that his counsel vigorously defended him throughout the trial, and
he omits to state how the result of his trial would have been different but for
his counsel’s conduct.  

Appellant’s counsel conducted a
proper voir dire in which he stated his intention to zealously represent his
client, he told the venire of his client’s right to not testify, and he questioned
the panel members on their ability to presume appellant’s innocence.  During trial he cross-examined all of the
State’s witnesses, made numerous objections that the trial court granted,
attacked the complainants’ testimony, and, during his closing, attacked the
credibility of the State’s witnesses.  At
the punishment stage, he kept out expert testimony on appellant’s gang affiliation
and presented witnesses on appellant’s behalf who, testified that appellant had
small children and a family that cared about him.  

We conclude that appellant has failed to overcome the presumption that
trial counsel had a plausible reason for his actions or to establish that no
reasonable attorney could have made the complained of decisions.  See
Thompson, 9 S.W.3d at 814; McFarland,
928 S.W.2d at 500.  Moreover, even if
appellant had established the first prong of Strickland by showing that his attorney’s performance fell below
the minimal standard of ordinary care required, he still has not shown that,
but for his counsel’s errors, the result of the trial would have been
different, as required to satisfy the second prong of Strickland.  See Strickland, 466 US at 687, 694, 104
S. Ct. at 2064, 2068.

          Appellant directs this Court to three cases in an
effort to establish that counsel’s behavior constituted ineffective assistance
of counsel. See Miller v. State, 728
S.W.2d 133 (Tex. App.—Houston [14th Dist.] 1987, pet. ref’d); Hutchinson v. State, 663 S.W.2d 610
(Tex. App.—Houston [1st Dist.], 1983, pet. ref’d); Ex parte Guzman, 730 S.W.2d 724 (Tex. Crim. App. 1987).  Each of these cases is distinguishable.

          In Miller, defense counsel was abusive throughout the trial.  See
728 S.W.2d at 134.  He openly antagonized
a member of the jury panel by accusing him of attempting to avoid jury duty and
repeatedly asked prospective jurors if he was making anyone mad.  Id.
at 134–35.  The court of appeals held
that defense counsel’s aggressive voir dire “could not have constituted trial
strategy.”  Id. at 134.   During the
trial, defense counsel ascribed bizarre and racist motivations to the witnesses
and referred to his client in derogatory and racist terms.  See id. at 135.   The
trial court held that counsel’s strategy was not reasonable but was “calculated
to damage [his client’s] cause” and that these and other errors gave rise to a
probability that, absent counsel’s errors, the result of the trial would have
been different.  Id.  In Guzman, the Court of Criminal Appeals likewise held defense counsel’s
representation deficient.  730 S.W.2d at
733.  The court found that defense counsel’s
inability to communicate with the appellant through an interpreter placed him
in a “poor position” to challenge the prosecution.  Guzman,
730 S.W.2d at 733–34.  The court also
found defense counsel ineffective because, he berated his client throughout the
trial and referred to him in pejorative terms.  Id.
at 725–27, 730–31.  In Hutchinson, trial counsel presented no
evidence on his client’s behalf, and he continually opened the door for the
State to present extraneous offenses, despite the trial court’s interventions
and attempts to protect the defendant’s rights. 
663 S.W.2d at 613–14.  Moreover,
defense counsel made no investigation of the facts of the case, and he “showed
a gross lack of knowledge and skill in voir
dire examination.” Id. at 614.

          These cases are clearly
distinguishable from the instant case, in which appellant’s counsel
investigated the case, called witnesses on appellant’s behalf, and otherwise
vigorously defended his client’s rights. 
A criminal defendant is not entitled to error-free counsel, but only to
counsel whose actions fall within the wide range of reasonable
representation.  See Robinson, 187 S.W.3d at 483. 

          We overrule appellant’s
third issue.

CONCLUSION

We affirm the judgment of the trial court.

 

 

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Do
not publish.   Tex. R. App. P. 47.2(b).











[1]
              Appellant
was indicted for the robbery of Lakisha Roberts in trial court cause number
1122699, appellate cause number 01-08-00934-CR, and for the robbery of
Antoinette Breed in trial court cause number 1165117, appellate cause number
01-08-00935-CR.

 





[2]
              See Tex. Penal Code Ann. §§ 29.02–.03 (providing elements for aggravated robbery).

 





[3]
              Kailen
lived with Brown and saw his mother Roberts only on the weekends.  On the morning of June 15, 2007, Brown drove
Kailen to the complainants’ apartment, where they spent the day. Both Brown and
Kailen were present when the events that lead to this appeal occurred.   





[4]
              Breed
identified Tillis by his nickname, “Little D,” and Thomas by his first name,
“Isaiah.”

 





[5]
              The
apartment was rented to Laura Fernandez, but Thomas and appellant had been living
there. 





[6]
              See also Scott v. State, No. 01-06-00151-CR, 2007 WL 2264458, at *3 (Tex.
App.—Houston [1st Dist.] Aug. 9, 2007, no pet.) (not designated for
publication) (holding that voice identification and circumstantial evidence of
the appellant’s identity are factually sufficient to support conviction); see also Chacon v. State, No.
14-07-00228-CR, 2008 WL 850130, at *4 (Tex. App.—Houston [14th Dist.] April 1,
2008, pet. ref’d) (not designated for publication) (holding that voice
identification based on foreign accent was legally and factually sufficient to
support conviction).